Exhibit 1 - Crouch MTD Memo 1

IN THE GENERAL SESSIONS COURT
FOR DICKSON COUNTY, TENNESSEE
AT CHARLOTTE

STATE OF TENNESSEE,          )
                             )
        Plaintiff,           )
vs.                          )          Docket No:  2021-CR-18
                             )
JOSHUA GARTON,               )
                             )
        Defendant.           )

_____

TRANSCRIPT OF PROCEEDINGS
PRODUCED FROM A COPIED COMPACT DISC OF THE RECORDED
PRELIMINARY HEARING HELD IN GENERAL SESSIONS COURT
Before the Honorable Craig Monsue
February 3, 2021
_____

APPEARANCES:

    For the Plaintiff:     Ray Crouch
                           District Attorney General
                           23rd Judicial District
                           P.O. Box 580
                           Charlotte, Tennessee 37036

    For the Defendant:     Jake Lockert
                           District Public Defender
                           23rd Judicial District
                           105 Sycamore Street
                           Ashland City, Tennessee 37015

                   ***************

                Kim Davidson, LCR
                *Davidson Reporting*
               *1270 Harristown Road*
           *Ashland City, Tennessee 37015*
                 *(615) 519-6754*

Exhibit 1 - Crouch MTD Memo          2

# I N D E X

Page

Opening Statements Waived

LISA BAKER
Direct Examination by General Crouch.......... 10
Cross Examination by Mr. Lockert.............. 25
ReDirect Examination by General Crouch........ 29

JONATHAN BAILEY
Direct Examination by General Crouch.......... 31
Cross Examination by Mr. Lockert.............. 57
ReDirect Examination by General Crouch........ 62
ReCross Examination by General Crouch......... 64
Further Redirect Examination by Gen. Crouch... 65

MELISSA BAKER BOHN
Direct Examination by General Crouch.......... 67
Cross Examination by Mr. Lockert.............. 71

CAPTAIN DONNY ARNOLD
Direct Examination by General Crouch.......... 75
Cross Examination by Mr. Lockert.............. 80
ReDirect Examination by General Crouch........ 81
ReCross Examination by Mr. Lockert............ 82
Further Redirect Examination by Gen. Crouch... 82
Further Recross Examination by Mr. Lockert.... 83

ROBERT TERRY CAUTHEN
Direct Examination by General Crouch.......... 85

AGENT JOE CRAIG
Direct Examination by General Crouch.......... 90
Cross Examination by Mr. Lockert.............. 102
ReDirect Examination by General Crouch........ 116
ReCross Examination by General Crouch......... 122

Closing Argument by General Crouch............ 126

Closing Argument by Mr. Lockert............... 132

Court's Ruling................................ 133

Exhibit 1 - Crouch MTD Memo                    3

# **E X H I B I T S**

Page

1   Facebook messages between Jonathan
    Bailey and Joseph Callaway                    57


2   Photograph posted by Joseph Callaway
    on Facebook                                   118


3   Digital copies of negative responses by
    DWC Construction after the posting of
    photograph by Joshua Garton                   121

Exhibit 1 - Crouch MTD Memo          4

```
 1                    P R O C E E D I N G S

 2              (WHEREUPON, the following proceedings were

 3     had in open court:)

 4              THE COURT:      Okay.  I think we've let

 5     everybody into the meeting room now.  We're ready to

 6     take up case number 2021-CR-18, State of Tennessee

 7     versus Joshua Garton.  The State's represented by

 8     District Attorney General Ray Crouch.  General Crouch is

 9     present in the courtroom.  Mr. Garton is represented by

10     Mr. Jake Lockert, District Public Defender.  Mr. Lockert

11     is joined in by Zoom.

12              What were we going to start with, Gentlemen?

13              GENERAL CROUCH:    Judge, the State had filed

14     a Motion For a Mental Health Examination and Competency

15     Exam.

16              THE COURT:      Mr. Lockert, can you hear

17     General Crouch?

18              MR. LOCKERT:      Yes, Your Honor.

19              THE COURT:      Okay.  So, let's see -- do

20     you have an extra copy of your motion, General?  I don't

21     know that I...

22              GENERAL CROUCH:    I do not.

23              THE COURT:      Okay.  Huh?

24              MR. LOCKERT:      We're agreeable -- we're

25     agreeable to an order to a mental health exam.  We're
```

Exhibit 1 - Crouch MTD Memo        5

1   doing the same thing in circuit.  The only drawback

2   right now is we've got hundreds of pages of documents

3   from Centerstone and Middle Tennessee Mental Health

4   wants to see all of the Centerstone records.  And

5   Ms. Jones in my office is asking if we can download them

6   on a thumb drive and give them to the person at

7   Centerstone.  That person has advised they now have

8   COVID and ask that we fax them.  We're trying to find

9   another way because it's been difficult to fax several

10  hundred pages.  Ms. Jones is working hard on getting

11  that done, so we should be ready for an evaluation next

12  week at the latest.  We're not opposed to the motion.

13          THE COURT:      All right.  So I've got a

14  copy of the agreed order that was signed from the -- by

15  Circuit Court Judge Wolfe from March of 2020.  So that

16  order, as far as the Court knows, would still -- would

17  still be a valid court order.  It was just that --

18          MR. LOCKERT:      Yes, Your Honor.

19          THE COURT:        -- that -- the order

20  states that Mr. Garton was to be referred to Centerstone

21  for the evaluation but has -- has the -- is Centerstone

22  doing the evaluations anymore or was there some other --

23  some other where else that was doing the evaluations?

24          MR. LOCKERT:     No, Your Honor.  Middle

25  Tennessee Mental Health is taking over now.

Exhibit 1 - Crouch MTD Memo    6

```
1              THE COURT:        Okay.

2              MR. LOCKERT:      That caused part of the

3    delay.  The main part of the delay is Ms. Jones has been

4    trying to get the records from Centerstone.  We believe

5    we have all the records now.  We've got to get them to

6    Middle Tennessee Mental Health.  The delay was not

7    anything that our client did or didn't do.  The delay is

8    us in getting those records from Middle Tennessee and I

9    think we've got them now.

10             THE COURT:        Okay.  Well, it sounds

11   like the State and defense are both in agreement for an

12   order for a mental health evaluation.  So there will be

13   an order out of circuit court and an order out of

14   general sessions court then.  So what's next then?

15             MR. LOCKERT:      Well, I don't know if

16   we're on the docket for a preliminary hearing today.  I

17   filed a motion, but I'm assuming if we're going to do a

18   preliminary hearing, we probably ought to do that first.

19             THE COURT:        Well, does the State and

20   the defense want to go forward with a preliminary

21   hearing in light of the pending evaluation?

22             GENERAL CROUCH:   Judge, my position is that

23   there are now two orders now from circuit court and

24   general sessions for mental evaluation.  I don't know

25   how we could go forward with that type -- with a
```

Exhibit 1 - Crouch MTD Memo        7

1   preliminary hearing.

2          MR. LOCKERT:    Well, if we're not going

3   to pursue the preliminary hearing at this time, I would

4   like to proceed with my motion.  My client, as far as

5   I'm concerned, is competent to assist me in whatever we

6   choose to do, the preliminary hearing or the Motion to

7   Dismiss.

8          GENERAL CROUCH:   Judge, a Motion to Dismiss

9   will be the preliminary hearing.  I mean, I have six

10  witnesses, three that will testify in person and three

11  that are holding online right now.

12         MR. LOCKERT:    I can tell the Court I've

13  talked to my client three times now.  He's competent for

14  us to do a preliminary hearing.

15         THE COURT:     Okay.  Well, we can go

16  ahead and do that.  Now, let me first say, Mr. Lockert,

17  I have reviewed your Motion to Dismiss.

18         MR. LOCKERT:    Yes, Your Honor.

19         THE COURT:     Now, I'll go ahead and say

20  that the Court's position on a review of your motion and

21  the memorandum supporting attached thereto as well as

22  the statute with which Mr. Garton is charged with

23  violating, it seems to the Court that your position that

24  this was protected speech under the First Amendment --

25  well, just -- maybe yes, maybe no, but the Court's take

Exhibit 1 - Crouch MTD Memo                    8

1  on it is kind of depends on what the proof the State

2  would show at a preliminary hearing.  I mean, certainly

3  we could -- the State was ready to go forward with that

4  and you're saying you're ready to go forward and your

5  client is competent for preliminary hearing purposes.

6  We can go ahead and go forward with the preliminary

7  hearing.  And then certainly prior to the Court

8  ruling -- making any ruling as to probable cause can

9  certainly hear argument if you wish to make any

10  additional argument on your Motion to Dismiss at that

11  time.

12          MR. LOCKERT:     Yes, Your Honor.  I think

13  that's the best way to handle it.  Do the preliminary

14  hearing first and then the Court will be more informed

15  as to what the facts are.  Then as a part of the

16  argument at the end of the preliminary hearing, I'll

17  make the motion to dismiss.

18          THE COURT:     Okay.  All right.

19  General, what -- what witnesses do you have online that

20  you plan to call?

21          GENERAL CROUCH:   Online, Your Honor, I have

22  Lisa Baker, Melissa Baker Bohn, and Jonathan Bailey.

23          THE COURT:     All right.  So what we'll

24  do then -- Mr. Lockert, do you request the Rule, sir?

25          MR. LOCKERT:     Yes, Your Honor.

Exhibit 1 - Crouch MTD Memo          9

1          THE COURT:          Okay.  What we'll do is we

2     will put the State's witnesses back into the lobby.  And

3     then as they're called, they will be admitted back into

4     the meeting one by one, okay.

5          Which witness do you plan to call first,

6     General?

7          GENERAL CROUCH:   Lisa Baker.

8          THE COURT:          We'll leave Mrs. Baker in

9     the meeting room.  Any of the other State's witness,

10    we'll take them out of the meeting room and put them in

11    the lobby that are on Zoom.  And the other State's

12    witnesses, if you will please step outside the courtroom

13    and we will call you back in when it is your turn to

14    testify, okay.

15         GENERAL CROUCH:   Your Honor, I will

16    designate Agent Craig as the State's witness and will

17    remain in the courtroom.

18         THE COURT:          Okay.  All right.  Agent

19    Joe Craig has been designated as the State's agent --

20    State's -- and he will be allowed to remain in the

21    courtroom during the proceedings.

22          All right.  Let's see, can I get some help

23    with the -- or, John, if we can take -- put Mr. --

24    Mr. Bailey and Ms. Baker Bohn back in the -- back into

25    the lobby, please.

Exhibit 1 - Crouch MTD Memo          10

```
 1            Okay.  And if you will -- Mrs. Baker, if you
 2  can please, if you would like to unmute your mic at this
 3  point.  Okay.  Can you say something, please?
 4            MRS. BAKER:      Yes, sir.
 5            THE COURT:       Okay.  We can hear you,
 6  great.  Thank you.  All right.  Then we'll go ahead and
 7  proceed with the preliminary hearing.  Did the State
 8  want to make an opening statement?
 9            GENERAL CROUCH:  Waived.
10            THE COURT:       Mr. Lockert, opening
11  statement?
12            MR. LOCKERT:     No, Your Honor.
13            THE COURT:       Okay.  Go ahead and call
14  your first witness, General.
15            GENERAL CROUCH:  The State calls Lisa
16  Baker.
17            THE COURT:       All right.  Mrs. Baker, if
18  you will raise your right hand and let me swear you in,
19  please.
20                      LISA BAKER
21  having been first duly sworn by the Judge to tell the
22  truth, the whole truth and nothing but the truth, was
23  examined and testified upon her oath as follows:
24  DIRECT EXAMINATION
25  BY GENERAL CROUCH:
```

Exhibit 1 - Crouch MTD Memo    11

1    Q.   Mrs. Baker, will you state your full name,
2    please?
3    A.   Lisa Shellack Baker.
4    Q.   Thank you.  And, Mrs. Baker, what is your
5    relationship to Daniel Baker?
6    A.   Daniel Baker is my husband.  I was widowed.
7    Q.   Now, I'm going to call your attention to Friday,
8    January the 22nd in 2021.  Do you remember that day?
9    A.   Yes.
10   Q.   Okay.  Did you receive a Facebook image that was
11   posted by Mr. Joseph Callaway?
12   A.   I did.
13   Q.   Okay.  How did you receive that image?
14   A.   It was a screenshot sent to me by a friend.
15   Q.   Okay.  How many times throughout the morning of
16   Friday, January 22nd, did you even receive the image or
17   text messages or phone calls or any type of
18   communication about the Facebook posting?
19              MR. LOCKERT:      Objection.
20              THE COURT:      Hold on just a moment.
21   Mr. Lockert, you --
22              MR. LOCKERT:      How many times she
23   received it unless she can testify to each and every
24   person that sent it to her.  If it's sent to her by 50
25   people other than my client, it's not relevant.

Exhibit 1 - Crouch MTD Memo    12

1    GENERAL CROUCH:    Actually, Judge, it would

2  be relevant because reception of a message can come

3  through third persons.  Just like if I mailed you

4  something and the mailman delivers it, it's being

5  received by a second person.

6    MR. LOCKERT:    I'll again object unless

7  she can testify who sent it to her.

8    GENERAL CROUCH:    I haven't asked her, but

9  what's his legal basis for the objection?

10    THE COURT:    I believe Mr. Lockert

11  stated relevance, General.

12    MR. LOCKERT:    Relevance and also

13  hearsay.

14    GENERAL CROUCH:    Well, the statute in

15  question, one of the elements is frequency or means of

16  communication.  So a relevant question would be

17  determining how many times Mrs. Baker received the

18  image.  Now, who all sends it to her, it was initiated

19  by the defendant.  So when he puts it out there to be

20  sent and circulated, he's responsible for every single

21  one of those deliveries.

22    MR. LOCKERT:    I'm prepared to argue the

23  face at this point, Your Honor, but still it is

24  relevant.  The statute is referring to a defendant

25  sending something.

Exhibit 1 - Crouch MTD Memo          13

1          GENERAL CROUCH:    Actually, Your Honor, the

2     statute specifically defines communication and it says

3     communication with a person that posted on or through a

4     social media network.  A social media network, by

5     definition, is a group of people who are intending to

6     communicate with one another.

7          MR. LOCKERT:      I will agree, Your Honor,

8     that each and every person who sent this to her would

9     also under General Crouch's theory be guilty of

10    harassment.  Therefore, I think it's important to know

11    who all the alleged parties of the crime are.  Anyone

12    who sent this to her if she found it harassing or

13    distressful in any way, each of those people need to be

14    looked at for sending something that's harmful.

15         GENERAL CROUCH:    Well, Your Honor, you have

16    to look at the intent of each person that was sending

17    it.  In this case, we know the intent by his other

18    communications of the defendant, whereas the third party

19    persons sending it to Mrs. Baker were concerned for her

20    health and safety.

21         THE COURT:      All right.  As to the

22    objection --

23         MR. LOCKERT:      The General is testifying.

24    He can't testify as to what their concern is.

25         THE COURT:      Thank you, Gentlemen.

Exhibit 1 - Crouch MTD Memo          14

1 Let's -- as to the objection for relevance perspective,

2 the Court is going to overrule in light of Mr. Lockert's

3 later argument.  Mr. Lockert, the Court would note that

4 Mrs. Baker will be subject to cross examination.  So if

5 you can certainly -- the State -- the Court would find

6 the State doesn't have to go into that at this point,

7 but you will have the opportunity to when you cross

8 examine her, but I'm going to overrule the objection as

9 to relevance.

10    Go ahead, General, ask your question again.

11 **BY GENERAL BAKER:**

12  Q.  Mrs. Baker, let me draw your attention back to

13 the number of times that you received the image.  Can

14 you recall?

15  A.  I would guess at least five or six times.  I

16 would have to go back and...

17  Q.  Did you receive phone calls and other messages

18 about the image?

19  A.  I did.

20  Q.  And what was the context of you receiving those

21 phone calls and messages?

22  A.  Just asking if I was doing okay or if I -- if I

23 had been on Facebook or, you know, if I was aware of

24 what was going on.

25  Q.  Do you know a Joshua Garton?

Exhibit 1 - Crouch MTD Memo          15

 1     A.   I do not.

 2     Q.   Do you know a Joseph Callaway?

 3     A.   No.

 4     Q.   When you received the image, what was your

 5   reaction and how did you feel?

 6     A.   Well, when I first saw it, I thought "what in the

 7   world am I looking at?"  But, you know, it was -- I was

 8   disgusted and then sad and then I became fearful.

 9     Q.   Why were you fearful?

10     A.   Just your mind starts racing on, you know, what's

11   the intent behind it and, you know, should I -- should I

12   be concerned with my safety, my child's safety.  You

13   know, there wasn't anything going on right now with the

14   other trial or anything to do with Daniel in the news,

15   so I wasn't sure, you know, if it was targeted.

16     Q.   Sure.  Now, were people forwarding or sending you

17   messages that Mr. Joseph Callaway had sent them through

18   Facebook Messenger?

19     A.   Yes.  I did receive some messages that were

20   people interacting with him separately.

21     Q.   Okay.  Did any of those messages reference you?

22             MR. LOCKERT:     Objection.

23             THE COURT:     Okay.  Just a moment.  All

24   right.  What's the objection, Mr. Lockert?

25             MR. LOCKERT:     Objection is going to be

Exhibit 1 - Crouch MTD Memo    16

1   time frame as to when she received those, whether it was

2   before or after it being posted (inaudible) online.

3   Whether or not it was before or after my client's -- the

4   warrant had been taken out.

5               THE COURT:        Okay.  General, if you

6   could lay a foundation.

7   **BY GENERAL CROUCH:**

8       Q.  Mrs. Baker, let's go back.  When did you receive

9   the -- what time was it when you received the very first

10  image?

11      A.  It was about -- I'd say a quarter till 8:00, ten

12  till 8:00.

13      Q.  In the morning?

14      A.  Yes, sir.

15      Q.  And you began receiving these forwarded

16  communications from a Joseph Callaway about what time?

17      A.  I really can't recall without pulling it up and

18  looking at it, but I believe I was still at work, so it

19  would have been before noon.

20      Q.  Before noon?

21      A.  Uh-huh.  And I wasn't on Facebook directly while

22  I was at work, so I'm unaware of when the TBI may have

23  posted whatever was posted.

24      Q.  Okay.  So to the best of your recollection, you

25  received these messages before noon?

Exhibit 1 - Crouch MTD Memo    17

1    A.  Yes.

2         GENERAL CROUCH:   Your Honor, the Court can

3  take judicial notice of the time that the warrant was

4  issued for Mr. Garton, which I believe would have been

5  after 2:30 p.m. on Friday, January 22nd.

6  **BY GENERAL CROUCH:**

7    Q.  Now, Mrs. Baker, back to my initial question.

8  Were these messages from Callaway in reference to you?

9    A.  There were a few, yes, that I would assume

10 reference -- he didn't call me by name, but he said "his

11 wife".

12   Q.  What did the message say?

13   A.  That the next thing that would be (audio

14 distortion).

15   Q.  Your -- the computer -- the sound went off for

16 just a second.  Could you repeat that?

17   A.  The message that I saw said that the next

18 photoshopped image would be of his wife.

19   Q.  Okay.  How did that make you feel?

20   A.  Well, it made me wonder what I had done.  You

21 know what --

22         MR. LOCKERT:    Objection.

23         THE COURT:    Mr. Lockert objected.

24 What --

25         MR. LOCKERT:    Basis of the objection is

Exhibit 1 - Crouch MTD Memo          18

```
 1    relevance.  If someone named Callaway shared a private
 2    conversation that they had with the defendant with this
 3    young lady, it's not relevant to what the intent was in
 4    posting this particular meme.  And a conversation in
 5    regard to what they might do in the future certainly is
 6    not relevant to the meme in question here and the charge
 7    in question here.
 8              GENERAL CROUCH:   Your Honor, it is
 9    absolutely relevant.  Part of the fear and annoyance
10    that was experienced by the victims is the fact that
11    there's this anonymous person with a mask on and a
12    Confederate flag posting a message -- a photo of someone
13    urinating on a grave and then sending private messages
14    threatening to upload more photos of Mrs. Baker.  How is
15    that not relevant in a harassment case?  This guy was
16    targeting the Baker family.
17              THE COURT:        Looking at the statute, of
18    course there's several different ways that -- under this
19    statute that harassment can be committed.  But there's
20    under (a)(1)(b), a reasonable person standard.  Under 2,
21    "requires intent that the frequency or means of the
22    communication annoys, offends, alarms, or frightens the
23    recipient and, by this action, annoys, offends, alarms
24    or frightens the recipient."  Or under number 4,
25    "communicates with another person or transmits or
```

Exhibit 1 - Crouch MTD Memo    19

1  displays an image without legitimate purpose with the

2  intent that the image viewed by the victim maliciously

3  intends the communication to be a threat of harm and a

4  reasonable person would perceive the communication to be

5  a threat of harm."

6      So certainly the Court would find that

7  Mrs. Baker's feelings or emotions or state of mind in

8  relation to these messages she was receiving would

9  entirely be relevant based under the standards as set

10  forth in the statute.  So the objection is overruled.

11      Go ahead, General.

12      MR. LOCKERT:    Your Honor, did -- Your

13  Honor.

14      THE COURT:    Yes, Mr. Lockert.

15      MR. LOCKERT:    That wasn't sent from my

16  client to this young lady.  Not disseminated to her in

17  any way.  It was a private conversation that was

18  screenshotted by another individual and sent to her.

19  Under the statute, clearly that does not encompass

20  someone else screenshotting a private conversation

21  saying bad things and then another person sending it to

22  that person.  I may say terrible things about somebody,

23  somebody I don't like, law enforcement or whatever, and

24  if somebody then takes that and relays it to another

25  person unbeknownst to me, how can I be held criminally

Exhibit 1 - Crouch MTD Memo    20

1  liable to that?

2          GENERAL CROUCH:   Your Honor, this statute

3  does not -- the harassment statute doesn't go to

4  content --

5          THE COURT:        Hold on.  Both of y'all

6  are talking.

7          MR. LOCKERT:        -- to the Court.

8          THE COURT:        What, Mr. Lockert?

9          MR. LOCKERT:     I'm asking the Court for a

10 ruling as to whether or not a private conversation not

11 disseminated by the defendant but someone else who

12 shares a private conversation with the alleged victim,

13 how is the defendant to be held criminally responsible

14 for that?

15         THE COURT:        Okay.  Well, before I

16 answer your question, I was going to give General Crouch

17 a chance to respond.  General Crouch.

18         MR. LOCKERT:     Yes, sir.

19         GENERAL CROUCH:  Thank you.  Judge, in the

20 harassment statute in Tennessee, the statute is narrowly

21 tailored to define action versus content and to

22 determine action and why the Court and proof can show

23 the intent.  These private messages to third parties

24 show the intent of the defendant to cause harassment and

25 to try to intimidate the Baker family.

Exhibit 1 - Crouch MTD Memo        21

1         Now, United States v. Gonzalez specifically

2    holds this.  It says:  "In a case like this, it's not

3    simply that the defendant made statements expressing

4    their beliefs but that these statements were sent to the

5    victim, the children, and third parties -- third parties

6    as an extensive and successful campaign to threaten,

7    intimidate, and harass."

8         The Court expects that if you send some type

9    of harassing or threatening message to a third party,

10   friends of Mrs. Baker, they will be expected to forward

11   those to Mrs. Baker for her concern.  That's exactly

12   what we have.

13        MR. LOCKERT:     You can't prove that was

14   the defendant's intent that that be relayed to the

15   victim.  He has no proof that that was the defendant's

16   intent.

17        GENERAL CROUCH:    Judge, that's what we're

18   doing is putting on proof.

19        MR. LOCKERT:     Until they can prove that

20   was my client's intent in private conversations, those

21   private conversations are not relevant, Your Honor.  He

22   may have said horrible things about Deputy Baker to

23   friends in private conversations.  That's not a crime.

24   Unless the State can prove that he intended for those to

25   then be relayed to the victim, it's not relevant.

Exhibit 1 - Crouch MTD Memo      22

1      THE COURT:      Well, Mr. Lockert, I agree

2   with you, but I don't -- insofar as I don't know what

3   the proof is going to end up showing.  I mean, that's

4   why we're having the preliminary hearing.  The burden of

5   proof is on the State.  If they're saying that this is

6   -- if their intention -- their position is that your

7   client -- there's probable cause to exist and believe --

8   or there's probable cause to exist and believe that your

9   client committed harassment against Mrs. Baker and

10  they're going to show or they can show that there was --

11  that that was your client's intent -- maybe they can,

12  maybe they can't.  We haven't gotten there yet, but --

13      MR. LOCKERT:      I agree, Your Honor.

14      THE COURT:      So --

15      MR. LOCKERT:      And it could be -- that

16  should be the foundation before they can go into any

17  horrible thing said in private conversations.  It should

18  not come into proof unless the State can lay a

19  foundation that those were intended to be disseminated

20  to the alleged victim.  That's all I'm --

21      GENERAL CROUCH:  Your Honor, that is not

22  the law.  The law does not require us to show that

23  portion of intent.  It requires us to show the intent to

24  commit harassment.  The intent.  Why did the defendant

25  post this image?  We have to show his intent for that

Exhibit 1 - Crouch MTD Memo    23

1  image to be meant as harassment.  We're not trying to

2  regulate the content.  We're trying to show why he did

3  it, his intent to do this posting.

4          MR. LOCKERT:     And, Your Honor, if he can

5  show that these private conversations were intended to

6  be disseminated and intended as harassment as opposed to

7  a private discussion of a public matter about not liking

8  police, not liking this officer, whatever, the State has

9  to lay a foundation that that was intended to be

10  disseminated and to be for the purpose of harassment.

11          GENERAL CROUCH:  We will.  As soon as we

12  get to our next witness.

13          THE COURT:     All right.  Well, did you

14  hear General Crouch, Mr. Lockert?

15          MR. LOCKERT:    I -- I think he said he

16  would do that with his next witness.

17          THE COURT:       Well, as far as -- as far

18  as that goes, I'm not going to tell or dictate to the

19  State how they try their case or present their case, nor

20  would I do the same to you, Mr. Lockert, and dictate to

21  you how you would have to proceed with your case on your

22  client's behalf; so...

23          MR. LOCKERT:     I understand, Your Honor.

24  All I'm trying to do is make sure they comply with the

25  rules of evidence.  Private conversations that are

Exhibit 1 - Crouch MTD Memo    24

1   screenshotted is hearsay.  It has to be a foundation as

2   to why it's relevant, what the intent of that private

3   conversation was.  Otherwise, any private conversation

4   my client has with anybody, trashing Officer Baker or

5   the sheriff's department or anyone else, according to

6   the State's theory, that comes in.  Whether it's hearsay

7   or whatever, that comes in and should be relevant.

8            THE COURT:       Well, now, I was trying to

9   take all this in, but I haven't heard any statements

10  about what these messages may have contained or not have

11  contained.  I thought that we were at the point that the

12  question General Crouch asked was he asked Mrs. Baker

13  how did that make you feel getting these messages, and I

14  thought that that's where we're at at that point that

15  you objected to the relevance about her receiving these

16  messages from these third parties that were these

17  screenshots or whatever.  I didn't hear any testimony,

18  as far as the Court's aware, of any of the content of

19  any of these messages.

20           So with -- General Crouch, was that, in

21  fact, the -- I didn't want to mischaracterize your --

22  the testimony, but as far as your question you asked of

23  your witness?

24           GENERAL CROUCH:   Yes.

25           THE COURT:       Okay.  Well, I'll just say

Exhibit 1 - Crouch MTD Memo    25

1  that I'll -- as far as any objections on that, you know,

2  I'm just going to table that for right now and --

3            MR. LOCKERT:     Yes, Your Honor.

4            THE COURT:       As far as just the nature

5  of this case that we're talking about communications

6  through social media and all that entails, then I'll

7  just go ahead and say that I want to -- you know, the

8  State's got to get there and I'm going to give them the

9  opportunity to get there.  And whether they do or

10 whether they don't, that's up to them.  So let's just go

11 ahead and plow forward.

12           GENERAL CROUCH:   Judge, that's all the

13 questions I have for Mrs. Baker.

14           THE COURT:       All right.  Mr. Lockert?

15 **CROSS EXAMINATION**

16 **BY MR. LOCKERT:**

17    Q.  Mrs. Baker, do you recall giving a statement to

18 News Channel 2 after you became aware of this meme and

19 what was said?

20    A.  Yes.

21    Q.  And on Channel 2, do you recall saying "I have

22 lived through the worst and continue to just push

23 forward.  There's not so much that people in this world

24 can do to surprise me.  All I can do is pray for the

25 lost soul responsible and for the safety of law

Exhibit 1 - Crouch MTD Memo    26

1    enforcement."  Does that sound correct?

2        A.  Yes.

3        Q.  You didn't tell them you were afraid for you and

4    your family?

5        A.  I didn't think that was relevant for News 2.

6        Q.  You didn't tell them that.

7        A.  Do I let the world know that I'm fearful?  No.  I

8    don't want people showing up at my door.

9        Q.  You didn't tell them that you were afraid for you

10   and your family?

11       A.  No.  I wasn't asked that question.

12       Q.  Okay.  I'm just (inaudible).  Now, if this

13   case -- your husband Officer Daniel Baker was (audio

14   distortion) and not deceased, would you have considered

15   (audio distortion) threatening or anything like that?

16       A.  Can you repeat that?  The microphone cut out.

17       Q.  If your husband had not tragically lost his life

18   in the line of duty and were not dead and, in fact, was

19   still alive, would you have considered this meme to be

20   anything other than in just poor taste?

21       A.  Well, I don't live in a make believe world.  It

22   is what it is.  As much as I wish that he were here

23   today, he's not.  So I don't know how I would feel about

24   it if he were here.

25       Q.  You certainly wouldn't be near as afraid if your

Exhibit 1 - Crouch MTD Memo          27

1  husband was still around?

2      A.   I don't believe that to be true because there are

3  a lot of families, law enforcement families, that are

4  fearful and their spouses are here.

5      Q.   Are you aware that on social media people post

6  memes (audio distortion) all the time?

7      A.   No.

8      Q.   Do you think a meme with somebody peeing on a

9  cop, would you consider that to be (audio distortion) if

10  they posted a picture?

11          GENERAL CROUCH:    Judge, I'm going to object

12  to speculation and relevance.  I mean, we're not talking

13  about any other cop.  We're talking about someone who

14  was murdered in the line of duty whose wife is now

15  testifying.  Mr. Lockert will never know that feeling.

16  So for him to compare some meme on Facebook to real life

17  facts, that's calling for the witness to speculate as to

18  how somebody else would feel who has not experienced and

19  in the position that she's in.

20          THE COURT:        Mr. Lockert, I -- before

21  we get to that, is that the phone on your desk ringing,

22  sir?

23          MR. LOCKERT:      What?

24          THE COURT:        Was that phone, is that

25  the phone on your desk that's ringing or by your desk?

Exhibit 1 - Crouch MTD Memo       28

1          UNIDENTIFIED PERSON:  It's mine.

2          THE COURT:        Huh?

3          UNIDENTIFIED PERSON:  (Inaudible).

4          THE COURT:        Oh, is it your phone?

5     Okay.  I would --

6          MR. LOCKERT:      (Inaudible).

7          THE COURT:        Okay.  We were -- I was

8     hearing a phone ringing.  It seemed like it was

9     interfering with audio, but -- okay.

10         So, Mr. Lockert, one more time for me

11    because -- what was the question specifically you asked

12    Mrs. Baker?

13         MR. LOCKERT:      If your husband were still

14    alive today as opposed to being dead, would you have

15    considered this meme as being harassing versus

16    (inaudible)?

17         GENERAL CROUCH:   Judge, that was already

18    asked and answered.

19         MR. LOCKERT:      She hasn't asked for me to

20    clarify again.  So I assume she can answer.

21         THE COURT:        Yes, General, I'm going to

22    -- Mrs. Baker, for the Court's clarity, can you please

23    answer that question?

24         MRS. BAKER:       Can you repeat the

25    question?

Exhibit 1 - Crouch MTD Memo    29

```
 1              MR. LOCKERT:      Yeah.
 2   BY MR. LOCKERT:
 3     Q.  If your husband -- if your husband was still
 4   alive and working for the sheriff's department and
 5   (audio distortion) this meme today, you consider that
 6   harassing or intimidating as you would knowing that he's
 7   dead?  Would it be a different situation?
 8     A.  It may have been presented a little bit
 9   differently as far as -- I mean, it would still be
10   fearful because, I mean, he still would be out in the
11   world trying to protect the community and it would still
12   make me feel like he and myself and my family would be
13   targeted.
14              MR. LOCKERT:      That's all I have.
15              THE COURT:        Any redirect?
16              GENERAL CROUCH:   Just one.
17   REDIRECT EXAMINATION
18   BY GENERAL CROUCH:
19     Q.  Mrs. Baker, just to follow up.  I know we've
20   talked about several instances where you received this
21   image.  I think you testified that you were at work and
22   couldn't get on Facebook; is that right?
23     A.  Yes.
24     Q.  Do you work in Dickson County?
25     A.  Yes.
```

Exhibit 1 - Crouch MTD Memo    30

1    Q.   Okay.   Thank you.

2              THE COURT:        Mr. Lockert, any recross?

3              MR. LOCKERT:       No questions.

4              THE COURT:        Okay.  Mrs. Baker, you're

5    excused as a witness.  If you want to leave the meeting,

6    you can do that, or if you want to stay in the meeting,

7    you can stay in the meeting.  If you would please mute

8    your microphone if you do stay, though, okay.

9              MRS. BAKER:        Okay.

10             THE COURT:        Thank you.

11             MRS. BAKER:        Thank you.

12             THE COURT:        Next witness?

13             GENERAL CROUCH:    The State calls Jonathan

14   Bailey.

15             THE COURT:        All right.  We can let

16   Mr. Bailey into the meeting room.  Mr. Bailey, you can

17   unmute your microphone, sir.  There you go.  Okay.  You

18   can hear us?

19             MR. BAILEY:        Yes, Judge.

20             THE COURT:        Okay.  All right.  The

21   State has called you as a witness.  If you will, please

22   raise your right hand and let me swear you in.

23             (Whereupon, the Judge administers the oath

24   to the witness).

25             THE COURT:        Thank you.  Your witness,

Exhibit 1 - Crouch MTD Memo          31

1  General.

2  **JONATHAN BAILEY**

3  having been first duly sworn by the Judge to tell the

4  truth, the whole truth and nothing but the truth, was

5  examined and testified upon his oath as follows:

6  **DIRECT EXAMINATION**

7  **BY GENERAL CROUCH:**

8  Q.  Mr. Bailey, will you state your full name,

9  please?

10  A.  Jonathan Boyd Bailey.

11  Q.  Thank you.  And where do you work, Mr. Bailey?

12  A.  I am medically retired.

13  Q.  Thank you.  Do you know Lisa Baker?

14  A.  I do.

15  Q.  Did you know Sergeant Daniel Baker?

16  A.  I do.

17  Q.  And what was your relationship with Sergeant

18  Daniel Baker?

19  A.  Daniel was my best friend.

20  Q.  Was he a part of your wedding?

21  A.  He was in my wedding.

22  Q.  Pardon?

23  A.  He was the best man in my wedding.

24  Q.  And are you still friends with Mrs. Lisa Baker?

25  A.  Yes, sir, I am.

Exhibit 1 - Crouch MTD Memo        32

1    Q.  Let me call your attention to the morning of

2   January 22nd.  Did you have a Facebook Messenger

3   communication with a Joseph Callaway?

4    A.  Yes, sir.

5    Q.  Did you know Joseph Callaway?

6    A.  No, sir.

7    Q.  Did that conversation or series of messaging

8   occur at approximately 7:29 a.m.?

9    A.  Yes, sir, I believe that's when I sent the brief

10  message to him.

11   Q.  Thank you.  And did you preserve those

12  communications?

13   A.  Yes, sir, I did.

14   Q.  Okay.  Do you have those with you now?

15   A.  I submitted those what I do have copies of, yes,

16  sir.

17   Q.  Okay.  So do you have them available to refer to

18  as we go through this questioning?

19   A.  Yes, sir.

20   Q.  Okay.  What was the -- what was your first

21  communication with Joseph Callaway at 7:29 a.m. on

22  January 22nd?

23              MR. LOCKERT:      Objection.

24              GENERAL CROUCH:   What's the legal basis?

25              THE COURT:      What's the basis,

Exhibit 1 - Crouch MTD Memo    33

1  Mr. Lockert?

2          MR. LOCKERT:      Hearsay.

3          GENERAL CROUCH:   I asked him what his

4  communication was.

5          THE COURT:        Well, I don't know if it's

6  hearsay or not, Mr. Lockert.

7          MR. LOCKERT:      As long as he doesn't

8  testify to what Callaway told him or shared with him,

9  that's fine.

10         GENERAL CROUCH:   Well, Judge, let's just go

11 ahead and have that hearing because he will be because

12 Callaway is Garton and these are statements and

13 admissions of the defendant.  So they're not hearsay.

14         MR. LOCKERT:      Your Honor, they're

15 hearsay if a person who alleges they heard or was told

16 these conversations is not here to testify they're

17 hearsay.

18         GENERAL CROUCH:   He is here to testify.

19 He's talking to him right now.  His name is Jonathan

20 Bailey.  He had this communication with the defendant.

21 The defendant, by his own admission, is Joseph Callaway.

22 That's part of the problem with these alleged First

23 Amendment claims is that you have somebody who has taken

24 the persona of Joseph Callaway in order to commit this

25 harassment.  So if the issue is going to be proving the

Exhibit 1 - Crouch MTD Memo    34

1  identity of Callaway, we can continue this and I can

2  call another witness out of order, but Mr. Lockert is

3  also saying that we can't put down any proof to show the

4  intent of Joseph Callaway because we can't prove who he

5  is?

6         MR. LOCKERT:    No, Your Honor.  If he can

7  prove that Callaway is my client and if he can -- if

8  he's going to show the Court that he will prove that

9  with another witness, that's all right with me.  But I

10 don't want him testifying about something that a Joseph

11 Callaway told him if he can't later prove that that was,

12 in fact, my client.  But if he's saying he can prove

13 that with a later witness, that's fine.

14        GENERAL CROUCH:    Judge, that is an argument

15 to be made by the defense.  Whether they choose to

16 continue forward with this persona of Joseph Callaway is

17 their choice, but we have proof and an admission of

18 Garton to using Callaway as his Facebook profile.

19        THE COURT:    Mr. Lockert, according to

20 General Crouch, the State is prepared to present proof

21 of that later in this hearing, that Joseph Callaway, the

22 online persona, is, in fact, your client.

23        MR. LOCKERT:    And that's the reason I

24 said, if the State is saying they can do that through

25 substantive proof, that's fine.  I won't object.

Exhibit 1 - Crouch MTD Memo      35

1           THE COURT:        Okay.  Objection

2    withdrawn.  Go ahead, General.

3    **BY GENERAL CROUCH:**

4       Q.  Mr. Bailey, let's go back to my question, which

5    -- January 22nd, 7:29 a.m., you asked through Facebook

6    Messenger a question of Mr. Joseph Callaway; is that

7    correct?

8       A.  Yes, sir.

9       Q.  And what did you ask?

10      A.  I said, "I just want to know why?  Daniel was the

11   best man at my wedding and a good friend.  He was a good

12   cop.  We both treated people right.  If this is what you

13   think he deserves, you didn't even know him."

14      Q.  And what was Joseph Callaway's reply?

15      A.  "You think that's bad, my friend, the party has

16   only just begun.  That was just a little taste of what I

17   can do."

18      Q.  Okay.  And then your next question?

19      A.  I said, "I am sure, but why?"

20      Q.  His answer?

21      A.  "Because I can."

22      Q.  And your next statement or question?

23      A.  "No doubt you have the right to say or do

24   whatever you want.  Why Daniel though?"

25      Q.  His response?

Exhibit 1 - Crouch MTD Memo     36

1    A.   "Because I can.  He ain't going to be the only

2  one.  I have a list and I intend on keeping that list."

3    Q.   Your question?

4    A.   "Of dead police officers?"

5    Q.   His response?

6    A.   "Yes, you are totally correct.  And what's the

7  objective here that you are trying to get me to

8  understand?"

9    Q.   And what was your response?

10   A.   "I don't have any objectives, man.  It's just

11 hard to understand.  He was a good dude.  I was a cop

12 for many years, and there may be bad ones out there but

13 there is way more good than bad.  I know I won't change

14 your mind.  It's just hard to understand."

15   Q.   And his next statement?

16   A.   "The question is have I done any crime?"

17   Q.   And your answer?

18   A.   "As far as the post?"

19   Q.   His response?

20   A.   "Photoshop is a crime."  And then he sent a

21 picture of -- looks like two gentlemen urinating

22 defacing a grave stone.

23   Q.   And in the picture that he sent you, is the image

24 of Daniel Baker on the tombstone?

25   A.   No, sir, it's not.

Exhibit 1 - Crouch MTD Memo   37

1    Q.   So he's showing you an image -- he sent you an

2    image of a tombstone of two men urinating on it without

3    Daniel Baker's image?

4    A.   Yes, sir.

5    Q.   Okay.  And then I think you responded to that

6    image.

7    A.   He's continued talking here.  He says, "here is

8    the original.  Actually came off the back of a CD case."

9    Q.   Okay.  And what did you say?

10   A.   "I know it wasn't Daniel's grave site, but trust

11   me, I've been there a bunch of times.  It's still just

12   unbelievable to me.  Why piss on a dead cop who is

13   actually a great dude?  The whole message just doesn't

14   make sense to me."

15   Q.   And what did he say?

16   A.   "So tell me the crime that I've committed."

17   Q.   And your answer?

18   A.   "I haven't accused you of any crime."

19   Q.   Callaway?

20   A.   "Well, you kind of did when you said 'as far as

21   the post'."

22   Q.   And your response?

23   A.   "With a question mark, my man.  I mean, I don't

24   know you personally.  I don't think I have any friends

25   that know you.  We have 25 mutual friends but none of

Exhibit 1 - Crouch MTD Memo    38

1  them know you."

2     Q.  His response?

3     A.  "No one knows me, my dude, and no one is ever

4  going to.  You can have the best tracking devices as

5  possible.  I think before I post something."

6     Q.  All right.  And your next question to him?

7     A.  "So what is your mission?"

8     Q.  His answer?

9     A.  "What's my mission?  That's my mission.  Dickson

10  County cops have falsely accused my boys of crimes they

11  have not committed and they will pay, every single one

12  of them.  So they sent a professional like me to drag

13  the attention that I exactly want to know that they work

14  for us, not themselves.  Trust me, I got 20 other people

15  that can get the attention and the word out legally

16  without anyone or any casualties.  I took four years of

17  criminal justice.  I know what to say and what to do.

18  If I didn't know what I was doing, I wouldn't have done

19  it in the first place.  So maybe next time they'll think

20  who they fuck with.  Trust me, I get paid regardless."

21     Q.  And your answer?

22     A.  "So you're just trolling them to get them mad?"

23     Q.  And what did he say?

24     A.  He said, "and it seems that I got the attention

25  that I want."

Exhibit 1 - Crouch MTD Memo          39

1    Q.   Your response?

2    A.   "I got you.  So the objective is to call

3    attention to your cause?"

4    Q.   His answer?

5    A.   "This is just only a taste of what we're doing.

6    Sometimes you have to shake things up and rattle some

7    cages, and it seems that my post is going all over

8    Facebook and I am loving it."

9    Q.   What was that last paragraph again?

10   A.   "And it seems that my post is going all over

11   Facebook and I'm loving it."

12   Q.   Okay.  And your response?

13   A.   "Oh, no doubt.  I just wish there was another way

14   for you to get your message out other than Daniel, other

15   than hate."

16   Q.   Callaway said?

17   A.   "No, there is no other way.  Cops think they have

18   more power than what they can handle.  Dickson County

19   cops are crooked, pathetic, low lives.  How can I prove

20   this?  I have plenty of cases that are on my desk right

21   now.  Eight people have been falsely accused of crimes

22   that they haven't even committed.  What do you call

23   that?"

24   Q.   And your answer?

25   A.   "A matter of jurisprudence.  Something that if

Exhibit 1 - Crouch MTD Memo          40

1  true can have severe judicial ramifications, things that

2  are handed civilly in court, things that cops don't get

3  away with."

4     Q.  And Callaway's response?

5     A.  "Police are not accountable for anything.  It's

6  their word over our word.  So since they think they have

7  power, they forget people like me will make their job

8  solely harder than what it is.  I'll make them cry like

9  little -- like little babies and the people who follow

10 them."

11    Q.  And your response to him?

12    A.  "That's not true.  Police are held way more

13 accountable than you image.  I've witnessed with my own

14 eyes officers get relieved of their duties without

15 upholding their oath."  And the next question I asked

16 him was:  "Who is the cop that falsely accused your

17 folks?"

18    Q.  And his answer?

19    A.  "Yeah.  Falsely accusing my folks.  And the D.A.

20 and judges, all of them are going to have it handed to

21 them.  They just got to wait in line."

22    Q.  Your response?

23    A.  "Which cop was it?"

24    Q.  Answer?

25    A.  "That's classified."

Exhibit 1 - Crouch MTD Memo    41

1    Q.  Your response?

2    A.  "Oh, I got you."

3    Q.  Callaway?

4    A.  "Let's just say I have plenty of them on the

5    radar.  It's only a matter of time with another little

6    picture of them will surface to the internet."

7    Q.  And your response?

8    A.  "Another photoshopped one?"

9    Q.  Callaway?

10   A.  "Maybe, maybe not.  I plead the Fifth."

11   Q.  Your response?

12   A.  "Laugh out loud.  This isn't an interrogation,

13   man.  I'm just conversing.  If anything, just trying to

14   understand.  You don't have to plead anything with me.

15   I'm just a civilian."

16   Q.  His response?

17   A.  "It doesn't matter.  You used to be a cop."

18   Q.  Your response to him?

19   A.  "Key word, used to."

20   Q.  Callaway?

21   A.  "I know my rights.  I took four years of criminal

22   justice at Stamford University."

23   Q.  Your response?

24   A.  "Stamford in Connecticut?"

25   Q.  His response?

Exhibit 1 - Crouch MTD Memo    42

1    A.   "Yes.  'I used to be a cop' is the key word.  I

2  understand that.  But you work for a crooked judge,

3  crooked D.A.s, et cetera."

4    Q.   Your response?

5    A.   "So do you hate all cops or just Dickson County

6  cops?  I've never worked in Dickson as an officer."

7    Q.   And his response?

8    A.   "I haven't gotten to the point of expanding on

9  hating cops yet.  I'm only starting with just the

10  Dickson County cops.  I've seen the way they treat

11  people personally.  I just have to keep in the shadows.

12  I keep my mouth quiet, I listen.  I understand by

13  listening to them, I react to it.  Just what you're

14  seeing right now is only a taste of what's coming,

15  legally speaking."

16    Q.   Your response?

17    A.   "Are you from Dickson or just have a connection

18  to Dickson from your friends?"

19    Q.   Callaway?

20    A.   "I have connections all over the world.  People

21  get in contact with me to make other people's life a

22  living hell.  I guess in your words you call it trolling

23  and I call it making your jobs a little harder."

24    Q.   Let me back up just a second, Mr. Bailey.  Did

25  Callaway say "people getting in contact with me to make

Exhibit 1 - Crouch MTD Memo        43

1  other people's lives a living hell"?

2     A.   Yes.

3     Q.   Thank you.   And then your response to that?

4     A.   "I don't use it as a condescending term.   It's a

5  tactic called trolling."

6     Q.   His response?

7     A.   "That's the difference in trolling and making a

8  statement."

9     Q.   Callaway?

10    A.   "I got you.   What is the statement?   I still

11 haven't figured out from your original" -- this is my

12 reply.

13    Q.   Sure.   Okay.

14    A.   "I got you.   What is the statement?   I still

15 haven't figured out from your original post.   Paying my

16 respects to Deputy Daniel Baker.   Was upsetting them

17 making their jobs harder?"

18    Q.   Callaway?

19    A.   "Have you read through the comments that were

20 posted on that?"

21    Q.   Your response?

22    A.   "I haven't.   Are they just mad people?   It was

23 just sent to me this morning as a picture.   I haven't

24 even looked at the post."

25    Q.   Callaway?

Exhibit 1 - Crouch MTD Memo        44

1    A.    "Well, you should take a look at it and come back

2  to me and see how the statements actually work on people

3  actually getting mad and trying to report it to the

4  police knowing that it's photoshopped, but they're too

5  stupid to realize it's photoshopped.  Cops get that

6  report, they find out it's photoshop, they see it, they

7  get mad."

8    Q.    And your response?

9    A.    "Well, I don't think there's many cops around

10  Dickson that don't know what Daniel's grave looks like.

11  It's very unique.  They surely know it's photoshopped."

12    Q.    Callaway?

13    A.    "I know where his grave is at.  I followed their

14  police cruisers all the way there.  And that's for me to

15  know."

16    Q.    Your response?

17    A.    "Yeah.  I guess I'm just still confused, but

18  that's not your fault.  It's mine.  I don't get how

19  Daniel deserved this.  He was a good one, not a bad

20  one."

21    Q.    Callaway?

22    A.    "I always do my research.  You have to know who

23  -- you have got to know your enemies.  There is no good

24  cops."

25    Q.    Your response?

Exhibit 1 - Crouch MTD Memo    45

1    A.   "We'll just have to agree to disagree on that

2    one.  I know (inaudible)."

3    Q.  Callaway?

4    A.   "When you put a badge on, you become an enemy.

5    It doesn't get any more simpler than that."

6    Q.  And I want you to read that paragraph again.

7    A.   "When you put on a badge, you become the enemy.

8    It doesn't get any more simpler than that."

9    Q.  Go ahead.

10   A.   "You work for Red Coats governments who are

11   crooked and who have stolen this land from the natives

12   and Mexicans made.  (Inaudible) to put everyone in

13   place.  If they don't walk the line, you just put their

14   ass in jail.  That's called slavery.  You putting

15   someone somewhere underneath their own free will,

16   freedom is a joke.  Just like the law, we have to treat

17   it as a joke."

18   Q.  Your response?

19   A.  Can I get some water?  I'm sorry.

20   Q.  Sure.

21   A.  My response:  "So it's an anti-government agenda

22   then?  Not just cops.  Just the government in general.

23   So you don't think people who cause innocent people harm

24   should be accountable for their actions?"

25   Q.  Callaway?

Exhibit 1 - Crouch MTD Memo    46

1     A.   "What do you think the Mexicans and natives went

2   through when they got black slave owners who come in

3   this world, shot and killed, raped and murdered, and

4   said that all men" -- sorry.  (Inaudible).

5     Q.   You're right.

6     A.   "And said that all men are -- men and women are

7   created equal besides blacks, natives, and women.  And

8   you know who cops are.  They work for those.  They are

9   the problem, not the solution.  Putting people in jail

10  does not reduce crime.  It's not even buy a nickel.  All

11  it does is create people who hate them more.  I mean,

12  I'm a very intelligent man, so please do not act like I

13  am illiterate.  Cops, government, D.A.s, CIA, FBI, et

14  cetera, they are the problem in this country.  They are

15  not the solution.  It's a fact.  It's not even an

16  opinion, my dude.  I can point out millions of trillions

17  of things that the problem is."

18    Q.   Your response?

19    A.   "Hold on a second.  I was away from the P.C.  Let

20  me read."

21    Q.   Callaway?

22    A.   "You think congress is going to listen to me?

23  No.  Because they've got their heads so damn far -- so

24  far up their ass, they couldn't see the truth if it

25  smacked them across the face.  No one cares about

Exhibit 1 - Crouch MTD Memo          47

1  anybody until a statement is made and everybody wants to

2  listen.  That's how the world works."

3      Q.  And your response?

4      A.  "I never accused you of being illiterate.  I'm

5  just trying to better understand your cause.  I know

6  that it's definitely going to be hard to get someone the

7  level of congress to listen to (inaudible).  But don't

8  you think that this will just make cops mad?  I don't

9  see how it changes their actions.  I think it continues

10  to divide police officers from the citizens.  That can't

11  be good, right?"

12      Q.  Callaway?

13      A.  "That's how it works.  They get mad and they

14  cross the line.  I sue them.  I make money off of them.

15  Eventually, they get so sick of me that they'll know who

16  is in charge.  I'm just waiting.  They made the decision

17  to falsely accuse my boys, my crew.  They started this

18  war.  The war has only begun.  They want division.

19  That's why they carry that thin blue line.  And don't

20  tell me it's about fallen brothers because it isn't."

21      Q.  And your response?

22      A.  "Got you.  I know what happened.  It was just on

23  my heart and I owe it to Daniel to ask that you take

24  down the post.  I know you probably won't, but I wish

25  you would use something else now that you have

Exhibit 1 - Crouch MTD Memo        48

1  everyone's attention.  He was a really good dude.  He
2  let more people go than he ever arrested, and he treated
3  everyone fairly.  He would give you the shirt off his
4  back literally.  I couldn't sleep tonight if I didn't at
5  least ask.  I get that you want to make things different
6  and you have a cause.  I just ask that you do something
7  else."
8      Q.  Callaway?
9      A.  "That's just some sad pathetic excuse of why you
10 carry it."
11     Q.  Your response?
12     A.  "Well, for me personally, it was about the ones
13 we lost and that became even more personal when I lost
14 Daniel.  I think everyone has their own opinion of what
15 a symbol means, like the Confederate flag you have in
16 your picture.  It's not all about hate.  I've heard
17 people say it is.  It will be mine.  It means a lot to
18 me (inaudible) my friends.  Not the way you imagine.  I
19 never (inaudible) us versus them.  I just want people to
20 have my (inaudible)."
21     Q.  Callaway?
22     A.  "That's not the fact.  The thin blue line means
23 division between the police and the citizens.  You want
24 to be a part of the citizens, start carrying a United
25 States flag (inaudible).  But when you start desecrating

Exhibit 1 - Crouch MTD Memo    49

1  the flag, you've already broken the law of penal code of

2  respect for our flag."

3  Q.  And your response?

4  A.  "Most all of our uniforms have the U.S. flag on

5  them.  The thin blue line is for fallen police officers.

6  It's not a secret club or something."

7  Q.  Callaway?

8  A.  "You want to be the solution to bringing the

9  police and the citizens together, maybe start with the

10 flag desecration thing.  And trust me, it is a law and

11 you can look it up."

12 Q.  Your response?

13 A.  "Oh, I know it's the law.  I was in the military

14 before I became a police officer, and I don't own one of

15 those American flags with a thin blue line.  I have a

16 simple black flag with a blue line in between them.

17 What it means for me?  I lost my best friend just doing

18 a job, a hard one, one that you can't please everyone.

19 If you make one side happy, the other is mad.  He was

20 just trying to get home to his wife and daughter."

21 Q.  Callaway?

22 A.  "Well, thanks for your service of the military.

23 I did boot camp training."

24 Q.  Your response?

25 A.  "Daniel served two tours in Iraq in his initial

Exhibit 1 - Crouch MTD Memo    50

1  surge.  He has (inaudible) when Saddam was still alive.

2  He was a true war hero until (inaudible)."

3     Q.  Callaway?

4     A.  "Well, Daniel is dead."

5     Q.  Your response?

6     A.  "Oh, I know, man."

7     Q.  Callaway?

8     A.  "He died serving the wrong side.  Once was a hero

9  and then became an enemy."

10    Q.  Read that paragraph again, please.

11    A.  "He died serving the wrong side.  Once was a hero

12 and then became an enemy."

13    Q.  Your response?

14    A.  "That's the (inaudible) of your mission.  I don't

15 harbor hate.  I just want what's best for Daniel's

16 family and -- that's left behind and those of us who

17 really loved him."

18    Q.  All right.  And Callaway?

19    A.  "Well, maybe he shouldn't have served the wrong

20 side of -- I mean, I can do some photoshop of his wife.

21 I've got plenty of ideas running through my mind.  That

22 will really shake up some people."

23    Q.  Let me stop you right there.  Mr. Bailey, in that

24 paragraph when you read Callaway's response, "I mean, I

25 can do some photoshop of his wife," who is he -- who do

Exhibit 1 - Crouch MTD Memo        51

1    you think he's referring to?

2        A.   Lisa Baker.

3        Q.   And he says, "I've got plenty of ideas that's

4    running through my mind"?

5        A.   Yes, sir.

6        Q.   What was your response?

7        A.   "She's completely innocent, man.  She never wore

8    a badge."

9        Q.   All right.  And what was Callaway's response to

10   that?

11       A.   "Then she married a traitor, a Red Coat.  Knew he

12   was a traitor, treason.  Just as guilty.  She didn't

13   have a gun pointed to her head when she married the man.

14   She did that of her own free will."

15       Q.   All right.  Mr. Bailey, in reading that

16   paragraph, Callaway is saying that Mrs. Baker married a

17   traitor, a Red Coat, someone who committed treason; is

18   that right?

19       A.   Yes, sir.

20       Q.   And he's also saying that Mrs. Baker is just as

21   guilty?

22       A.   Yes, sir.

23       Q.   And your -- from your reading of that, he's

24   accusing both Daniel and Lisa Baker of having committed

25   treason?

Exhibit 1 - Crouch MTD Memo    52

1    A.  Yes, sir.

2    Q.  What was your response?

3    A.  "That would just make everyone turn away from

4    your cause."

5    Q.  And Callaway?

6    A.  "And that's fine.  You're going to have people

7    who are going to hate you.  You're going to have people

8    that's going to love you.  I don't owe anything to

9    anyone.  My message will be very crystal clear.  Trust

10   me, I did it -- I didn't just upload it to Facebook.  I

11   uploaded it on a ton of websites.  One website I have

12   about 98 percent of supporters behind me.  You just have

13   a couple of boot lickers."

14   Q.  In Callaway's statement there, he's saying he not

15   only uploaded it to Facebook but to, quote, a lot of

16   websites?

17   A.  Yes, sir.

18   Q.  Thank you.  And your response?

19   A.  "I'm sure there's a lot of supporters.  But for

20   your message to work, you're going to have to bring

21   together the ones you disagree with to come to terms."

22   Q.  Callaway?

23   A.  "Since you have a military background, how would

24   you treat treason, or I can just ask him, a military

25   buddy of mine."

Exhibit 1 - Crouch MTD Memo    53

1    Q.   Your response?

2    A.   "Who is committing treason?"

3    Q.   Callaway?

4    A.   "Please answer the question.  How would you treat

5    treason?"

6    Q.   Your response?

7    A.   "Treason is punishable in many different ways.

8    Officers are arrested all the time for it and sentenced

9    to prison.  Treason is subjective too.  Depends on what

10   side of the fence you are on whether or not it's

11   treasonous."

12   Q.   Callaway?

13   A.   "Let's say if a soldier joins the enemy, what

14   does he become?  I would think he's been called treason.

15   If so, how would you treat it?"

16   Q.   And your response?

17   A.   "In today's time or 1776?  Because in today's

18   time, they put them in prison."

19   Q.   Callaway?

20   A.   "So why is it Officer Baker isn't in jail?  Is it

21   because he has (inaudible) privilege?  I mean

22   metaphorically speaking, when he was alive."

23   Q.   Your response?

24   A.   "How did he commit treason?  How did I commit

25   treason?  We literally served our country and then came

Exhibit 1 - Crouch MTD Memo          54

1    home and served our communities."

2       Q.  Callaway?

3       A.  "What treason is working with the enemy.  From

4    what you just basically told me, you became the enemy

5    (inaudible).  Remember, America was stolen.  So you

6    think it's okay for me to go in your house, prop my feet

7    up, and say I own your house?  That wouldn't be really

8    nice now, would it?"

9       Q.  Your response?

10      A.  "If America was stolen, you and I are guilty as

11   well."

12      Q.  Callaway?

13      A.  "I'm really not guilty at all, my native

14   heritage.  I am full on native part of Chickasaw tribe.

15   So your people are guilty, the English, the British."

16      Q.  Your response?

17      A.  "As do I, Cherokee from my grandmother's side."

18      Q.  Callaway?

19      A.  "I'm full.  Not half."

20      Q.  Your response?

21      A.  "European from my mother's side.  So half of my

22   people suffered the other half, I suppose."

23      Q.  Callaway?

24      A.  "There's a difference between raping my Native

25   American's people.  You think it's okay for your people

Exhibit 1 - Crouch MTD Memo    55

1    to die?  Natives are dying right now.  Have you seen it

2    lately?  You should take a trip and look."

3         Q.  Your response?

4         A.  "Take a trip where?"

5         Q.  Callaway?

6         A.  "Las Vegas, Nevada, and many other places around

7    the world where people are dying and having the white

8    man come steal our land.  But that's okay to you.

9    That's okay to come over and kill people, steal from

10   people.  You think that's okay."

11        Q.  And your response?

12        A.  "That's (inaudible), my man, which is why I

13   haven't been ugly to you or treated you any less, even

14   though you hurt me."

15        Q.  Callaway?

16        A.  "And back to what your boy did, treason.  You

17   work for people who stole this land from us, put us in

18   depression and killing off our culture.  But that's okay

19   to you because you're okay with working for those kinds

20   of people.  You're okay working for the enemy, putting

21   thousands and thousands of people in jail, ripping

22   families apart, killing people overseas because you were

23   tricked by the old age Confederate and killing each

24   other.  If you want peace, you have to have war."

25        Q.  Mr. Bailey, that was his final statement to you,

Exhibit 1 - Crouch MTD Memo          56

1  correct, "if you want to have peace, you have to have

2  war"?

3      A.  Yes, sir.

4      Q.  And going back to the top of that paragraph,

5  Mr. Callaway says "and back to what your boy did, his

6  treason"?

7      A.  Yes, sir.

8      Q.  And do you think he's referring to Daniel Baker?

9      A.  Yes, sir.

10     Q.  Upon receiving these messages back and forth with

11 Mr. Callaway, did that concern you?

12     A.  Absolutely.

13     Q.  What did you do about that concern?

14     A.  I forwarded the messages to the Dickson Police

15 Department to Mr. Donny Arnold.

16     Q.  And these -- this series of messaging back and

17 forth were -- all occurred before noon on Friday,

18 January 22nd?

19     A.  That sounds about right.  It was -- I believe so.

20     Q.  Okay.

21     A.  Yes, yes.

22     Q.  Were you concerned for the health and safety of

23 Mrs. Lisa Baker?

24     A.  I was.

25     Q.  Did you call or notify her of any of these

Exhibit 1 - Crouch MTD Memo    57

1    messages?

2    A.   I didn't get into detail of the messages.  I

3    didn't want to concern her, the messages that she and I

4    had, but I did check on her and then I also notified the

5    Dickson Police Department and the TBI was actively

6    investigating the situation.  So I didn't want to

7    interfere or get involved in any of that.  So I just

8    checked on her and made sure she was okay.  We had

9    communication later in the day where I told her that I

10   had some exchange with him and just (inaudible).

11   Q.   And, Mr. Bailey, you have read or tried to read

12   verbatim the words that were sent to you by Callaway and

13   your responses to him?

14   A.   Yes, sir.

15               GENERAL CROUCH:   I'll move a copy of these

16   messages as the State's first exhibit.

17               THE COURT:      Any objection,

18   Mr. Lockert?

19               MR. LOCKERT:     No, Your Honor.

20               THE COURT:      Okay.  That will be

21   State's Exhibit 1.

22               (Exhibit No. 1 marked and filed).

23               GENERAL CROUCH:   Pass the witness.

24   **CROSS EXAMINATION**

25   **BY MR. LOCKERT:**

Exhibit 1 - Crouch MTD Memo          58

1    Q.   Did Mr. Garton ask you to relay some threat to

2    Mrs. Baker?

3    A.   No, sir.

4    Q.   Did he tell you he was going to physically harm

5    her?

6    A.   No, sir.

7    Q.   Did he make a point over and over that he was

8    going to make these posts about cops, judges, and D.A.s

9    because, basically, he felt they've all committed

10   treason and (inaudible)?

11   A.   I believe so.

12   Q.   And you tried to advise him that he might get

13   more attention if he tried to pull the sides together,

14   but his belief was he's going to tag cops, D.A.s,

15   judges, and that's going to get the attention he wants

16   for corruption?

17   A.   And also Lisa Baker, which I couldn't quite

18   understand how that was going to get the attention for

19   corruption, but that was intended in his testimony.

20   Q.   Right.

21   A.   Yes, sir.

22   Q.   And that was -- that was something you asked him

23   about?

24   A.   I'm sorry?

25   Q.   He didn't initiate a conversation with you about

Exhibit 1 - Crouch MTD Memo     59

1    Lisa Baker, did he?

2        A.  Yes, sir.  I didn't mention Lisa Baker before

3    him.

4        Q.  His wife.  Did you mention Officer Baker's wife?

5        A.  I just mentioned his family, just (inaudible).

6        Q.  Right.

7        A.  Yes, sir.

8        Q.  But the gist of the conversation is he intends to

9    make these type posts of his -- not just Deputy Baker,

10   but he's going to do more cops, D.A.s, judges, and then

11   later on even cops' families?

12       A.  It appears.

13       Q.  But at no time did he threaten to harm any of

14   Deputy Baker's family?

15       A.  No, sir.

16       Q.  To your knowledge, did he threaten to harm her to

17   anybody?

18       A.  Not to my knowledge.

19       Q.  If Deputy Baker was still alive and he just

20   posted a photoshop picture of him peeing on the

21   photograph of Deputy Baker, would that be as much a

22   concern to you?

23       A.  (Inaudible).  Looking for to insight fear in me.

24   Daniel was shot and killed.  It's a lot different from

25   me --

Exhibit 1 - Crouch MTD Memo    60

1    Q.   Right.

2    A.   -- out in -- (inaudible) you know, said that he

3    shot and killed -- grave site of his photo, him

4    urinating on him, (inaudible) that's not normal.  That's

5    scary to me personally.  (Inaudible).

6    Q.   And are you aware that on Facebook there are

7    actually groups named Piss on Cops or Piss on Police?

8    A.   No, sir.  (Inaudible).

9    Q.   Are you aware that a common meme is photoshopped

10   pictures of people either peeing on cops or even a cow,

11   so there's cows peeing on cops?

12   A.   That is the first time I've ever seen

13   (inaudible).  Personally.

14   Q.   Well, what you're saying is anybody who

15   photoshops a picture and makes a meme of somebody peeing

16   on a photograph of a cop, you consider that to be a

17   crime?

18   A.   I think there's more to it than that.  I don't

19   think that this is just a picture of Daniel photoshopped

20   onto a picture of being urinated on.  I think there's a

21   lot more to it.  The communications that he had with me

22   and following the police cruisers, knows where Daniel's

23   grave site is.  I mean, that's where Lisa takes her kids

24   (inaudible) and visit her husband.  And this is -- you

25   know, I understand that -- you can see where he's making

Exhibit 1 - Crouch MTD Memo        61

1  threats against other officers.  So just in general, law

2  enforcement and government in general, that's how he did

3  it here, it started with Daniel Baker.

4        And he continued this conversation with me mostly

5  without Daniel Baker.  Then we go to Lisa.  You know,

6  he's got -- he's got ideas about Lisa.  I didn't put

7  that in his head.  He said himself he has ideas about

8  Lisa.  So, yes, it concerns me.  I don't think this is

9  just a normal situation where somebody puts "I hate

10  cops" on the internet.  This was specific.  It was about

11  Daniel.  It was, you know, urination on Daniel.

12        He basically just (inaudible) any communication

13  there followed that.  He didn't just put this on

14  Facebook and say "screw cops".  And then he starts

15  talking to me.  You know, he wants to tell me about how

16  Daniel is a treason -- a treasonous traitor.  How is

17  that (inaudible).

18    Q.  This was after he posted the meme?

19    A.  Yes, sir.  After he has posted the meme, yes,

20  sir.

21    Q.  And then he told you there were eight cops in

22  total that had mistreated them?

23    A.  I don't remember him giving me an exact number.

24    Q.  All right.  And he indicated to you that he was

25  going to post more --

Exhibit 1 - Crouch MTD Memo      62

1      A.   Yes, sir.

2      Q.   -- memes about cops, maybe even judges and D.A.s?

3      A.   Yes, sir.

4      Q.   And indicated that he would probably do the same

5   with Lisa Baker?

6      A.   Yes, sir.

7      Q.   And he didn't threaten to injure Lisa Baker.

8   Everything he talked about with you was posting memes

9   about --

10      A.   (Inaudible), yes, sir.

11            MR. LOCKERT:      Okay.  That's all the

12   questions I have.

13            THE COURT:       Redirect?

14            GENERAL CROUCH:   Yes, sir.

15   **REDIRECT EXAMINATION**

16   **BY GENERAL CROUCH:**

17      Q.   Mr. Bailey, following up with Mr. Lockert's

18   questions.  Although he doesn't list specifically harms

19   that he will commit, he's obviously -- his intent

20   appears to be to harass; is that right?

21      A.   Yes, sir.

22            MR. LOCKERT:      (Inaudible).

23            GENERAL CROUCH:   I mean, let's go back to

24   page 7.

25            THE COURT:       Hold on.  Mr. Lockert, did

Exhibit 1 - Crouch MTD Memo    63

1    you object?

2              MR. LOCKERT:      (No audible response).

3              THE COURT:        Yeah, I'm going to sustain

4    that objection.  That calls for a conclusion.

5              MR. LOCKERT:      (Inaudible) intent was

6    whether or not his intent was to harass or draw

7    attention to corrupt police.

8              THE COURT:        I've already sustained,

9    Mr. Lockert.  Go ahead, General Crouch.

10   **BY GENERAL CROUCH:**

11     Q.  Let me rephrase, Mr. Bailey.  Did Mr. Callaway

12   say "cops will pay, every single one of them"?

13     A.  Yes.

14     Q.  Did he say when they put on the badge, they

15   become the enemy?

16     A.  Yes.

17     Q.  Did he accuse Daniel Baker and Lisa Baker of

18   treason?

19     A.  Yes, sir.

20     Q.  Did he say he followed their police cruisers to

21   his grave?

22     A.  Yes, sir.

23     Q.  Did he say that they started this war and the war

24   has only just begun?

25     A.  Yes, sir.

Exhibit 1 - Crouch MTD Memo          64

1     Q.  Did he say that to have peace, you have to have

2   war?

3     A.  Yes, sir.

4     Q.  Did he say to have peace, you have to have

5   peaceful dialogue and discussion?

6     A.  No, sir.

7     Q.  He chose the word "war".

8     A.  Yes, sir.

9          GENERAL CROUCH:   Pass the witness.

10          THE COURT:        Recross, Mr. Lockert?

11   **RECROSS EXAMINATION**

12   **BY MR. LOCKERT:**

13     Q.  And the whole gist of his conversation with you,

14   his war was going to be posting memes about cops,

15   judges, and D.A.s.  He never said anything about

16   physically harming anybody, did he?

17     A.  I can't tell you what his intention is.  I just

18   (inaudible).  It gave me concern.

19     Q.  I'm not asking what you're concerned about.  Did

20   he say anything about hurting -- physically harming

21   cops, about families, D.A.s, or judges?

22     A.  No, sir.

23     Q.  Was the only threat he made was about posting

24   memes about cops, D.A.s, judges, and cops' families?

25     A.  I think that was the only (inaudible).

Exhibit 1 - Crouch MTD Memo      65

1      Q.   And he indicated that he had many more that he

2   could post?

3      A.   Yes, sir.

4           MR. LOCKERT:     That's all the questions I

5   have.

6   **FURTHER REDIRECT EXAMINATION**

7   **BY GENERAL CROUCH:**

8      Q.   Mr. Bailey, did he ask you how to punish treason?

9      A.   Yes.

10      Q.   And how did you interpret that?

11           MR. LOCKERT:     Objection.

12           GENERAL CROUCH:    Grounds?

13           MR. LOCKERT:     I didn't ask anything

14   about that in my recross, so it's not proper.

15           GENERAL CROUCH:   He asked about threats.

16   And when someone commits the crime of treason, Your

17   Honor, there's only two punishments.  And Mr. Bailey was

18   asked several times directly by Callaway "how would you

19   punish treason?"  He's trying to bait Mr. Bailey into an

20   answer.  That is a threat.  How do you punish treason?

21   He's already alleged that Daniel Baker and Lisa Baker

22   committed treason.  Now he's asking Mr. Bailey, "how do

23   you punish treason?"  Then he says, "well, is that why

24   Officer Baker is in jail metaphorically?"

25           THE COURT:      I'm going to sustain the

Exhibit 1 - Crouch MTD Memo          66

1    objection.  Let's move on.

2              GENERAL CROUCH:    Okay.  No further

3    questions.

4              THE COURT:      All right.

5              MR. LOCKERT:      Nothing further.

6              THE COURT:      Okay.  Mr. Bailey, you're

7    excused as a witness.  If you would like to stay in the

8    meeting and observe the proceedings, you can.  If you

9    will please mute your microphone.  Or you can leave the

10   meeting if you'd like, okay.

11             MR. BAILEY:      Yes, sir.

12             THE COURT:      Thank you.  Next witness?

13             GENERAL CROUCH:    Your Honor, the State

14   calls Melissa Baker Bohn.

15             THE COURT:      Mrs. Baker Bohn, can you

16   unmute your microphone?  Okay.  You're called as the

17   State's next witness.  Can you raise your right hand and

18   I'll swear you in, please?

19             (Whereupon, the Judge administers the oath

20   to the witness).

21             THE COURT:      Thank you.

22                    **MELISSA BAKER BOHN**

23   having been first duly sworn by the Judge to tell the

24   truth, the whole truth and nothing but the truth, was

25   examined and testified upon her oath as follows:

Exhibit 1 - Crouch MTD Memo        67

**DIRECT EXAMINATION**

**BY GENERAL CROUCH:**

Q.   Ms. Bohn, will you state your full name, please?

A.   Melissa Baker Bohn.

Q.   Thank you.  And, Ms. Bohn, what is your relationship to Daniel Baker?

A.   I'm his mother.

Q.   Thank you.  And on January the 22nd of 2021, did you receive or see on social media an image posted by the anonymous Joseph Callaway?

A.   I did.

Q.   And what was your reaction to that image?

A.   I was upset and crying and I (inaudible) and I didn't know (inaudible).  I didn't know (inaudible).

Q.   Thank you.  And, Ms. Bohn, did you see the image scattered over social media?

A.   Oh, yes.

Q.   About approx -- about how many times did you personally observe the image on different social media pages?

A.   I saw it between 20 and 25 times.  It kept appearing in my feed (inaudible) concern about it (inaudible).  And it continued to get continued notifications (inaudible).

Q.   Did you, in fact, attempt to ask people to remove

Exhibit 1 - Crouch MTD Memo      68

1    the image?

2        A.   I did.  I started asking several people that I

3    was personal friends with and asked them to remove the

4    photo that (inaudible).  And I asked them to replace it

5    with something different, something more positive.

6            I also did a post myself because I realized I

7    couldn't reach everybody.  I wasn't friends with

8    everybody there.  And I did a post myself.  Not even

9    saying what the original post was about, but asking if

10   they had reposted a hurtful image of Daniel, that they

11   request it from another posting.  Ultimately, un -- I

12   made that a private posting because it was shared like

13   187 times my post alone.  So it reached several, several

14   people.  And that told me that the one that was out

15   there was probably far beyond that.

16       Q.   Yeah.  Thank you.  And, Ms. Bohn, did you -- do

17   you know a Joseph Callaway?

18       A.   I don't.  I don't know how he even knows Danny.

19       Q.   And do you know Joshua Garton?

20       A.   No.  I saw the name (inaudible) after the fact,

21   but I don't know him.

22       Q.   Did this series of events that occurred on

23   January 22nd, did that cause you to fear -- to have

24   concern or -- explain your emotions that day.

25       A.   So I want my son remembered.  I didn't -- in a

Exhibit 1 - Crouch MTD Memo       69

 1  very positive way, not in a negative way.  And to me,

 2  this was very spiteful and unnecessary and I didn't know

 3  what the platform -- what the purpose was.  So I was

 4  instantly very aware and my senses were heightened as to

 5  Lisa and (inaudible), first of all.  Because if this

 6  person was directing it to Daniel, they were directing

 7  it to my family.  I didn't know where he was, where he

 8  was located, if he was near me, or if he was in Dickson

 9  County or whatever.  I did see the tag of Dickson County

10  Police Department.

11     Q.  When you say "the tag," are you referring to

12  that -- the hashtag that the poster created?

13     A.  Yes.  I'm referring to the hashtag and Daniel's

14  name.  He, in spite, intentionally typed -- or whoever

15  created the post typed "Daniel Baker" and showing

16  respect or disrespect of or whatever he had tagged with

17  that hashtag "Dickson County Police Department".

18          And so with all the violence that's going on

19  towards the police right now, it instantly took me back

20  to the day that Daniel was murdered on May 30th.  I

21  wasn't expecting that that day and I wasn't expecting

22  this on January 22nd.  I didn't know that there were

23  parties involved in any of those, but it took me back to

24  that moment in time and it made me fearful of what could

25  happen.

Exhibit 1 - Crouch MTD Memo          70

1    Q.  Okay.  Thank you.

2    A.  I --

3    Q.  Go ahead.

4    A.  I -- I just didn't understand it.  I was really

5    confused, and I didn't know what to think or what to

6    say.  I just wanted to know that my family was safe,

7    that I was safe.  I did ask if anyone had a picture of

8    the person that was doing -- just a basic picture, just

9    had a mask on.  And unfortunately, I live now looking

10   over my shoulder because, as you know, as everybody

11   knows, the trial for the (inaudible) hasn't happened.  I

12   didn't know if this person was related to the two that

13   are awaiting trial or what the intent could have been.

14   Q.  Is that part of your concern, that the anonymity

15   of this posting a person with a Confederate flag mask

16   on, the seemingly vile intent, I mean, did all of those

17   factors cause you to be fearful for your own life?

18   A.  Yes, yes.  Because I didn't know what -- what the

19   person looked like, if they were going to show up at my

20   door.  I mean, it's not hard to find us.  I mean,

21   everybody can see from everything that's been printed in

22   the papers and on social media and on the news networks

23   where we live and where we are.  Yeah, it concerned me a

24   lot that this anonymous person -- and I didn't know him.

25   And then to find out that it's a fake profile and seeing

Exhibit 1 - Crouch MTD Memo     71

1  all the other people's post and all the -- all the anger

2  that was out there.  I didn't know how much anger was --

3  that would cause somebody to do this, somebody I didn't

4  even know.

5              GENERAL CROUCH:   Thank you very much.  I'll

6  pass the witness.

7  **CROSS EXAMINATION**

8  **BY MR. LOCKERT:**

9     Q.  Did Mr. Garton or the alias Mr. Callaway send

10  this post to you in any way?

11     A.  No.

12     Q.  Did he tag you or any of Mr. Baker's family so

13  that they received this post from him?

14     A.  As far as tagging, I seen the hashtag where --

15  that (inaudible).

16     Q.  Tags for you so that it would show up on your

17  page?

18     A.  No.

19     Q.  Did he in any way threaten you physically or to

20  do harm to you or your family?

21     A.  Through the post, I took that as a threat because

22  I didn't know the intent of it.  I didn't -- and if

23  somebody posts something on social media and it has my

24  family's name on it, yes, I'm going take that as a

25  threat if it's derogatory or disrespectful and

Exhibit 1 - Crouch MTD Memo    72

1    encourages violent behavior.

2    Q.  So a picture of someone peeing on the photograph

3    of your son, you consider that to be a threat to you?

4    A.  I consider it to be disrespectful and I consider

5    it to -- you know, I consider it to be a threat if

6    anybody was doing anything to my family.

7    Q.  I understand.  Were you aware that this was

8    posted on his private Facebook page and not to the

9    public?

10   A.  I didn't know how it got out.  I'm not friends

11   with him, so I have no idea how it got out or where it

12   was.  I just seen it on -- on several pages and on other

13   people's Facebook pages.

14   Q.  Are you aware that it came to your attention and

15   your son's widow's attention by virtue of other people

16   sharing?

17   A.  Yes, I was well aware of that.  A post that he

18   put out there to be shared.

19   Q.  But are you aware that he posted it on his

20   private page, that it was not posted to the public, only

21   his friends could see it?

22   A.  I have no idea how he posted it.  I just know

23   that I saw it.

24   Q.  If he didn't post it to the public, would that

25   make any difference to you?

Exhibit 1 - Crouch MTD Memo          73

1    A.   Yeah, it would make a difference to me because I

2    want to know how he knows Daniel and why he has so much

3    hate for him.

4    Q.   I assume you don't agree that he thinks your

5    deceased son and a bunch of other officers and D.A.s and

6    judges are corrupt and treasonous and that he intends to

7    wage war on them with these type memes?  You assume --

8    you would call all that disrespectful, I assume?

9    A.   I would say if you have that sort of problem, he

10   went about it the wrong way.  You can have the problem

11   with somebody being corrupt or corruption.  There are

12   steps to follow and things that he can do besides

13   picking on my family who happens to be -- who I am still

14   grieving to this day and will continue the rest of my

15   life.

16             MR. LOCKERT:    I don't have any further

17   questions.  I do want to say that your son was truly a

18   hero.

19             MS. BOHN:       Thank you.

20             MR. LOCKERT:    After he was shot, I'm

21   sure you're aware, his last words were to save his own

22   partner and other officers.  So he is truly a hero.  I'm

23   sorry you're having to go through this.  I just wanted

24   you to know that.

25             MS. BOHN:       Thank you.

Exhibit 1 - Crouch MTD Memo    74

```
 1              MR. LOCKERT:      Nothing further.
 2              THE COURT:      General Crouch, any
 3  redirect?
 4              GENERAL CROUCH:   (No audible response).
 5              THE COURT:      Ms. Bohn, at this point
 6  you're excused as a witness.  If you would like to stay
 7  in the meeting, you certainly can.  If you would be so
 8  kind as to mute your microphone.  Or if you would like
 9  to leave the meeting, you can do that.  It's your
10  choice.  Okay?
11              Next witness, General?
12              GENERAL CROUCH:   The State calls Donny
13  Arnold.
14              THE COURT:      Donny Arnold.  Is he in
15  the office there?
16              GENERAL CROUCH:   They're looking.  I can
17  call another witness.
18              UNIDENTIFIED MALE:    He was in the
19  (inaudible).  He's in the main lobby.
20              THE COURT:      Mr. Lockert, would it be
21  okay with you if we just turned this -- turned the
22  laptop computer with the camera on it toward the witness
23  stand, would that be all right?
24              MR. LOCKERT:      That's fine, Your Honor.
25              THE COURT:      Okay.
```

Exhibit 1 - Crouch MTD Memo    75

1          (Whereupon, the Judge administers the oath

2     to the witness).

3               THE COURT:        Thank you, sir.

4                    **CAPTAIN DONNY ARNOLD**

5     having been first duly sworn by the Judge to tell the

6     truth, the whole truth and nothing but the truth, was

7     examined and testified upon his oath as follows:

8     **DIRECT EXAMINATION**

9     **BY GENERAL CROUCH:**

10        Q.   Would you state your full name, please?

11        A.   Donny Arnold.

12        Q.   That you.  And you're employed with the Dickson

13    Police Department?

14        A.   Yes, sir.

15        Q.   And were you working on January 22nd, 2021?

16        A.   Yes.

17        Q.   All right.  And the morning of January 22nd,

18    2021, did you see a posting or an image that was

19    published by Mr. Joseph Callaway?

20        A.   Yes, we did.  Yes, I did.

21        Q.   And where did you see this image?

22        A.   It came on my phone.

23        Q.   All right.  And what was the image?

24        A.   It was an image of two young men urinating on a

25    headstone.

Exhibit 1 - Crouch MTD Memo       76

 1            THE COURT:        Can you lean forward to

 2   the mic?  That way we might be able to pick you up on

 3   the picture.

 4                CAPTAIN ARNOLD:    And on the headstone was a

 5   picture of Daniel Baker.

 6   **BY GENERAL CROUCH:**

 7     Q.   And -- now, you have -- you knew Daniel Baker for

 8   a long time; is that correct?

 9     A.   Yes, sir.

10     Q.   And you were -- how would you characterize your

11   friendship with him?

12     A.   He was, if not my best friend, very much one of

13   my closest at the time of his death.

14     Q.   Did you get -- did you attend his funeral?

15     A.   Yes.

16     Q.   When you saw the image posted by Joseph Callaway,

17   did you think that was Daniel Baker's tombstone?

18     A.   Initially, kind of -- I didn't really focus on

19   the headstone more as the people urinating.  So,

20   initially, I had the -- I don't know, I guess first was

21   anger and shock of it, kind of sickening feeling.

22     Q.   Sure.

23     A.   Then as I looked at the picture, I was like, wait

24   a minute, that's not Daniel's headstone.  He doesn't

25   actually have a headstone upright like a tombstone, per

Exhibit 1 - Crouch MTD Memo    77

1  se.  It's more of a flat -- it's a flat marker.  So I

2  realized something was up.

3  Q.  It didn't take that long for you to understand it

4  wasn't the real --

5  A.  Correct, correct.

6  Q.  It was a photoshopped image?

7  A.  Correct.

8  Q.  Considering that it was photoshopped after those

9  initial emotions went through, what did you -- what was

10  your personal response and feelings about the post?  How

11  did it make you feel?

12  A.  I was still very annoyed and, I guess, pissed

13  off, for lack of a better term.

14  Q.  And why was that?

15  A.  Daniel -- like I said, Daniel and I were close

16  and I just thought it was just very, I don't know,

17  disrespectful and totally inappropriate.

18  Q.  And to you, the image portrayed by

19  Callaway/Garton's posting of two men urinating on a

20  tombstone with Daniel Baker's image, what message did

21  you receive from that?

22  A.  I'm not -- I'm not sure what message I got other

23  than, like I said, it was like a -- just a total

24  disrespect of -- of -- like anti police or anti -- you

25  know, beyond Daniel is law enforcement as a whole, I

Exhibit 1 - Crouch MTD Memo          78

 1  guess, would be -- and very disrespectful for the

 2  sacrifice given by Daniel.

 3      Q.  You're familiar with how Daniel Baker was

 4  murdered?

 5      A.  Yes, sir.

 6      Q.  Did you consider the anonymity of the posting in

 7  relation to how Daniel Baker was murdered?

 8      A.  Not -- I don't guess I really thought much about

 9  that.  At that time I didn't really -- didn't know it

10  was an anonymous post or someone hiding behind an

11  anonymous post but that was later found out.

12      Q.  And that's what I was merging into is did you

13  assist the TBI with investigating this case?  When I say

14  "assist," were you contacted by the TBI?

15      A.  Yeah.  Agent Craig and I talked several times

16  that morning.

17      Q.  Okay.

18      A.  Some information I was getting, I was just

19  feeding it straight to Joe throughout the morning.

20      Q.  All right.  At some point in the morning, did you

21  learn that Mr. -- that Joseph Callaway's Facebook page

22  was attempting to sell something through Facebook

23  Marketplace?

24      A.  Yes.  Yeah, that was probably about 8 o'clock or

25  so.

Exhibit 1 - Crouch MTD Memo    79

1    Q.  8 o'clock that morning?

2    A.  Yes, sir.

3    Q.  Do you remember what Callaway was attempting to

4    sell?

5    A.  Some kind of bed.  I don't remember any details

6    of it, but...

7    Q.  And did you pass that information along to Agent

8    Craig?

9    A.  No.  Actually, when I talked to Joe the first

10   time, he had already gotten that information somewhere

11   else.  So we both kind of heard about it.  And I think

12   they were working that angle at that time.

13   Q.  And that morning, did you also forward some

14   messages to the TBI from Mr. Jonathan Bailey?

15   A.  Yes.  Yeah.  Jonathan had -- he -- Jonathan was

16   also close to Daniel.  We kind of knew each other

17   through Daniel actually.  He was at the time of Daniel's

18   death was working at Benton County, and we just all kind

19   of knew each other.  I didn't know Jonathan as well, but

20   he -- when he was -- from -- he was sending me

21   screenshots, I guess the best way to put it, of what his

22   conversation was.

23   Q.  In summary, how -- again, you testified that you

24   felt anger?

25   A.  Yeah.

Exhibit 1 - Crouch MTD Memo    80

1      Q.   Annoyance?

2      A.   Yeah.   And nausea, I guess, would be -- it was --

3  it was nauseating, I guess, at first.   It was just

4  really -- it was just a lot of emotions.   A lot of

5  memories came back and a lot of things.

6      Q.   Thank you.

7           GENERAL CROUCH:   I pass the witness.

8  **CROSS EXAMINATION**

9  **BY MR. LOCKERT:**

10     Q.   (Inaudible), after Officer Baker was killed in

11  the line of duty, the legislature passed a Daniel Baker

12  Act; is that correct?

13     A.   Yes.

14     Q.   And that was legislation designed to speed up the

15  process when somebody received the death penalty and the

16  time that they would end up being executed, generally

17  speaking.

18     A.   Okay.   Was that a question?

19     Q.   Do you -- do you consider it unlawful when

20  someone disses cops that don't like cops?

21     A.   No.

22     Q.   And are you aware that people can give cops the

23  middle finger?

24     A.   Oh, yes, sir.

25     Q.   And you kind of consider that lawful if someone

Exhibit 1 - Crouch MTD Memo    81

 1  posted a meme on Facebook of someone peeing on a

 2  photograph of you?

 3     A.  I really haven't given that thought.

 4     Q.  I mean, you wouldn't like it.

 5     A.  Correct.

 6     Q.  You would think it was disrespectful.  But if

 7  someone did that, are you going to go out and arrest

 8  them for posting a photoshop photo of somebody peeing on

 9  your picture?

10     A.  No, they're not going to be arrested.

11         MR. LOCKERT:    All right.  That's all the

12  questions I have.

13  **REDIRECT EXAMINATION**

14  **BY GENERAL CROUCH:**

15     Q.  Mr. Arnold, you're still alive?

16     A.  Yes, sir.

17     Q.  You weren't murdered.  You're sitting here alive

18  testifying today.

19     A.  Yes, sir.

20     Q.  So Mr. Lockert's concept of what's illegal in

21  your life does not apply to the facts and circumstances

22  of the Baker family.

23     A.  That's correct.

24     Q.  Thank you.

25         THE COURT:      Recross, Mr. Lockert?

Exhibit 1 - Crouch MTD Memo    82

1          MR. LOCKERT:       Yes, Your Honor.

2    **RECROSS EXAMINATION**

3    **BY MR. LOCKERT:**

4      Q.  You remember Deputy (inaudible), don't you?

5      A.  Yes, sir.

6      Q.  If someone posted a photoshop meme of somebody

7    peeing on the photograph of Deputy (inaudible), would

8    you go out and arrest them?

9      A.  If it -- if it violated the harassment statute as

10   the General had -- we discussed that day, I would -- I

11   would say so.  Although, I never went out and arrested

12   anyone at this time for anything.

13     Q.  So if it was a live officer, you wouldn't arrest

14   them, but if it's a dead officer, you would go arrest

15   them if General Crouch told you to?

16     A.  I would follow the law.  And as far as in my

17   career, I've always found that the district attorney's

18   office is usually our best guidance on following the law

19   if we have doubt on that.

20          MR. LOCKERT:     That's all the questions I

21   have.

22   **FURTHER REDIRECT EXAMINATION**

23   **BY GENERAL CROUCH:**

24     Q.  Mr. Lockert asked you about if you would go

25   arrest somebody for harassment.  Simply seeing an image

Exhibit 1 - Crouch MTD Memo       83

1    alone would likely not cause you to go arrest somebody

2    for harassment, correct?

3        A.   Correct.

4        Q.   Now, what if combined with that image the person

5    that posted the image also said that "I get paid to make

6    other people's lives a living hell"?  What if they said,

7    "you think that's bad, my friend, the party has only

8    just begun.  That's just a little taste of what I can

9    do."  You see we're developing more evidence --

10       A.   Yes, sir.

11       Q.   -- in harassment; is that right?

12       A.   Yes, sir.

13       Q.   What if they also said -- and forget cops.

14   Anybody.  A regular citizen. -- "they will pay, every

15   single one of them."  Now, you start combining the

16   statements of the poster with the post is what leads to

17   harassment; is that correct?

18       A.   Yes, sir.  That's -- I do believe so.

19                GENERAL CROUCH:   All right.  Pass the

20   witness.

21   **FURTHER RECROSS EXAMINATION**

22   **BY MR. LOCKERT:**

23       Q.   And if his statement was that he doesn't like

24   cops, judges, and D.A.s and he's going to post more

25   photos on cops and judges and D.A.s and essentially

Exhibit 1 - Crouch MTD Memo          84

1  declaring war against them, you wouldn't like that,

2  would you?

3     A.  No, I suppose not.

4     Q.  Are you saying if somebody posts a picture

5  photoshop of someone being on a photo of Judge Monsue

6  and General Crouch --

7              GENERAL CROUCH:   Which they have done.

8  **BY MR. LOCKERT:**

9     Q.  -- and me and another officer, and are you going

10 to arrest that person for harassment?

11    A.  No.  Not just that in and of itself, no.

12    Q.  Not -- but if they tell you that the reason

13 they're doing it is because they think police are

14 corrupt and they want to draw attention to it and

15 they're declaring war on corrupt cops, then you would

16 arrest them.  Is that what you're saying?

17    A.  No, I don't think that's what I said.

18              MR. LOCKERT:      That's all the questions I

19 have.

20              GENERAL CROUCH:   No further questions.

21              THE COURT:        All right.

22              CAPTAIN ARNOLD:   Thank you.

23              THE COURT:        You can stay in the

24 courtroom if you'd like.  Next witness?

25              GENERAL CROUCH:   State calls Robert

Exhibit 1 - Crouch MTD Memo          85

1   Cauthen.

2          THE COURT:     If you will just come up

3   here to the stand, please, sir.  Will you raise your

4   right hand for me so I can swear you in?

5          (Whereupon, the Judge administers the oath

6   to the witness).

7          THE COURT:     Thank you, sir.  If you

8   will please be seated.

9                 **ROBERT TERRY CAUTHEN**

10  having been first duly sworn by the Judge to tell the

11  truth, the whole truth and nothing but the truth, was

12  examined and testified upon his oath as follows:

13  **DIRECT EXAMINATION**

14  **BY GENERAL CROUCH:**

15     Q.  Mr. Cauthen, will you state your full name,

16  please?

17     A.  Robert Terry Cauthen.

18     Q.  Thank you.  And, Mr. Cauthen, you live in Hickman

19  County; is that correct?

20     A.  Yes, sir.

21     Q.  And for the past six or seven months, has the

22  defendant, Mr. Garton, been living with you?

23     A.  Yes, sir.

24     Q.  And does -- how long have you known Mr. Garton?

25     A.  I've known him through my granddaughter for about

Exhibit 1 - Crouch MTD Memo    86

1    a year or year and a half before then.  He was dating

2    her and was going to propose marriage to her.

3        Q.  Okay.  How did Mr. Garton come to be living with

4    you?

5        A.  He said that the people that he was living with,

6    the lady committed suicide.

7                    MR. LOCKERT:    Objection.

8                    THE COURT:    Just a moment.  I'm sorry.

9                    MR. LOCKERT:    Objection.

10                   THE COURT:    Yes, Mr. Lockert?

11                   MR. LOCKERT:    Hearsay.

12                   GENERAL CROUCH:    Statements of the

13   defendant.

14                   THE COURT:    I think Mr. Cauthen is

15   testifying to statements your client made to him,

16   Mr. Lockert.  I'm going to allow it.

17                   MR. LOCKERT:    (Inaudible) as to when and

18   what is it relevant to?

19                   GENERAL CROUCH:    It's relevant to where the

20   defendant currently resides or no longer resides as of

21   (inaudible).

22                   THE COURT:    Okay.  I'm going to allow

23   it.  Go ahead, General.

24   **BY GENERAL CROUCH:**

25       Q.  Go ahead, Mr. Cauthen.

Exhibit 1 - Crouch MTD Memo   87

1    A.   He was -- I was told that the lady committed

2   suicide and he didn't have any other place to stay.

3    Q.   Okay.  So you let him stay there?

4    A.   Yes, sir.

5    Q.   Did he have a job?

6    A.   No, sir.

7    Q.   How did -- did he pay you rent?

8    A.   He paid me through some company.  I don't know

9   what it was.

10    Q.   Was it the Mental Health Cooperative?

11    A.   Yes, sir.

12    Q.   They sent you checks directly?

13    A.   Yes, sir.

14    Q.   Because the defendant didn't have a job?

15    A.   No.

16         MR. LOCKERT:     Objection.  Objection.

17   Relevance.  How is this relevant to this charge, Your

18   Honor?

19         THE COURT:      General?

20         GENERAL CROUCH:  What's his question?

21         THE COURT:      What's the relevance to

22   the charge of harassment?

23         GENERAL CROUCH:  Well, establishing where

24   he lives and how he got internet service.  I've got to

25   lay a foundation.  If I don't do that, then Mr. Lockert

Exhibit 1 - Crouch MTD Memo    88

1  will object to that.

2          MR. LOCKERT:    Your Honor, they have his

3  admission that he made the post.  So I don't know how

4  this is relevant on (inaudible).

5          GENERAL CROUCH:  So is that an issue any

6  longer?  Can we all agree that Callaway is Garton?  Are

7  you stipulating to that and I can just not call -- ask

8  any more questions?

9          MR. LOCKERT:    Yes.

10          GENERAL CROUCH:  He is?

11          MR. LOCKERT:    Yes.

12          GENERAL CROUCH:  That Callaway is Garton?

13          MR. LOCKERT:    Yes.

14          GENERAL CROUCH:  Okay.  No more questions.

15          THE COURT:    It's stipulated.

16  Mr. Lockert, questions?

17          MR. LOCKERT:    No, Your Honor.

18          THE COURT:    Mr. Cauthen, thank you,

19  sir.  You can step down.  And you can remain in the

20  courtroom if you'd like or you're excused and you can

21  leave if you'd like.

22          MR. CAUTHEN:    All right.  Thank you,

23  sir.

24          THE COURT:    Thank you.  Next witness?

25          GENERAL CROUCH:  Judge, our last witness

Exhibit 1 - Crouch MTD Memo     89

1    will be Agent Joe Craig, and I need five minutes.  I

2    left the video of the interview with the defendant, I

3    need to go get it, and I also need to use the bathroom.

4              THE COURT:       All right.  Let's take a

5    five-minute break then, okay.  Any objection,

6    Mr. Lockert?

7              MR. LOCKERT:      That's fine, Your Honor.

8              THE COURT:       Okay.  We'll take a break.

9              (Whereupon, a recess is taken).

10              GENERAL CROUCH:   Judge, I have -- before we

11    start, my next and last witness is Agent Craig.  Now,

12    there's a recorded interview of the defendant just so

13    everybody is on the same page.  I'm going to be playing

14    the interview from this thumb drive because it's easier

15    to control, but I've burned a copy as the exhibit to

16    disc to submit to the Court.  Is everybody okay with

17    that?

18              MR. LOCKERT:      Yes, Your Honor.

19              THE COURT:       Okay.  All right.  That

20    will be fine.

21              GENERAL CROUCH:   The State calls Agent Joe

22    Craig.

23                      **AGENT JOE CRAIG**

24    having been first duly sworn by the Judge to tell the

25    truth, the whole truth and nothing but the truth, was

Exhibit 1 - Crouch MTD Memo    90

1    examined and testified upon his oath as follows:

2    **DIRECT EXAMINATION**

3    **BY GENERAL CROUCH:**

4       Q.   Agent Craig, will you state your full name for

5    the Court, please?

6       A.   Joe Craig.

7       Q.   Thank you.  You're employed with the Tennessee

8    Bureau of Investigation?

9       A.   Yes, sir.

10      Q.   And on January 22nd, 2021, were you ordered by me

11   to come to Dickson County or did I request the services

12   of the Tennessee Bureau of Investigation?

13      A.   You requested the services of the TBI.

14      Q.   I notice in Mr. Lockert's motion he keeps

15   referring to me ordering you, but have I ever ordered

16   you to do anything?

17      A.   No.

18      Q.   A request?

19      A.   You request.

20      Q.   Thank you.  All right.  So on January 22nd, 2021,

21   you were requested by me to investigate the desecration

22   of a grave?

23      A.   That's correct.

24      Q.   And what happened?

25      A.   I contacted our technical services agent assigned

Exhibit 1 - Crouch MTD Memo    91

1  to my unit and provided the information that you had

2  provided and that Captain Arnold had provided, and we

3  were able to make identification -- a possible

4  identification on a Joseph Callaway.

5  Q.  Thank you.  You -- how long did it take you to

6  realize that it was a photoshopped image?

7  A.  Two seconds.

8  Q.  Two seconds.  Not long?

9  A.  No.

10  Q.  And from there as you were in Dickson County,

11  were you receiving additional information about the

12  posting?

13  A.  I was.  Getting back to the photoshop question,

14  just to verify and for a factual basis, I did go to

15  Memorial Gardens to compare the photo to the actual

16  marker of Sergeant Daniel Baker.  And I knew going up

17  there, but I wanted to verify it 100 percent it was not

18  the same image.

19  Q.  When the image first came out, did you know who

20  Joseph Callaway is or was?

21  A.  No, sir.

22  Q.  Okay.  And you were in the courtroom.  We

23  stipulated that Joseph Callaway is, in fact, Joshua

24  Garton?

25  A.  Yes, sir.

Exhibit 1 - Crouch MTD Memo    92

Q. And at some point during the day before you knew
that Callaway was Garton, were you trying to identify
who Joseph Callaway was?

A. I was, yes.

Q. All right. And how did that develop?

A. As we were in the process of trying to make
contact through -- there was an individual who was
communicating with him that we found on Facebook
Messenger and was able to pick up on the live
communication. At that point, I reached out to that
individual and asked him that he not engage him and not
plan to meet him, but that I would like to meet with
him.

Q. Okay. And this -- this Facebook Marketplace, is
that the name of it?

A. Yes, it is.

Q. And so the person Joseph Callaway was on Facebook
Marketplace trying to sell something?

A. He was -- he had listed -- Joseph Callaway listed
a bed for sale. I believe it was for $100.

Q. Where was the arranged purchase supposed to
exchange?

A. The meeting place?

Q. Yeah.

A. It was my understanding that Joseph Callaway

Exhibit 1 - Crouch MTD Memo     93

1  would not be meeting, but he would send a friend to

2  meet.  And the location was established to be Walmart in

3  Dickson.

4      Q.  And did that happen?

5      A.  No, it did not.

6      Q.  Did you go to Walmart in Dickson?

7      A.  I went to the general area and I had officers

8  there in the area.

9      Q.  All right.  What happened after that?

10     A.  Before the meeting was to take place, information

11  came that Joseph Callaway was, in fact, Joshua Garton in

12  photo because of individuals on social media had already

13  established an identity and was sending it out all over

14  social media.

15     Q.  At some point in the day, did you actually meet

16  with Joshua Garton?

17     A.  I did.

18     Q.  How did that happen?

19     A.  I was notified by the Dickson Police Department

20  that Joshua Garton was sitting in their lobby and he

21  came in to talk to the police.

22     Q.  So you didn't go find him?

23     A.  No.

24     Q.  Did you give him a message to meet you at the

25  police department or did he just randomly show up?

Exhibit 1 - Crouch MTD Memo          94

1  A.  He apparently went on his own.

2  Q.  You had nothing to do with Joshua Garton arriving

3  at the Dickson Police Department?

4  A.  No.  It's my understanding -- and I can tell you

5  the TBI had no contact with Joshua Garton prior to

6  walking into the lobby of the Dickson Police Department

7  and seeing him.  He was -- he came on his own volition.

8  He came in to -- from what I understand, to speak with

9  detectives about this situation.

10  Q.  All right.  When you got to the police

11  department, did you attempt to speak with Mr. Garton?

12  A.  I did.

13  Q.  Did you, in fact, conduct an interview?

14  A.  Yes, sir.

15  Q.  Do you remember about what time that interview

16  occurred?  Before or after lunch?

17  A.  It was after lunch.

18  Q.  And I'm -- I'm now going to refer you to the big

19  screen, which you can see on the Thumb Drive D, we

20  have -- the interview appears to be broken into two

21  segments; is that right?

22  A.  It is.

23  Q.  I'm going to play that for the Court.

24  (Inaudible).

25  A.  I believe it may be the bottom one first.

Exhibit 1 - Crouch MTD Memo    95

```
 1              GENERAL CROUCH:   Okay.  Play the bottom one

 2    first.

 3              (Respite).

 4              THE COURT:        Is that computer not going

 5    to play it, General?

 6              GENERAL CROUCH:   It's not going to play it.

 7    My computer will play it, but this one --

 8              AGENT CRAIG:      General, can I -- I may be

 9    able to get it to play.  It was -- I had the same issue

10    with my laptop.

11              THE COURT:        Okay.  Do you want to step

12    down to see if you can do it?

13              AGENT CRAIG:      Yes, sir.

14              THE COURT:        How long is this supposed

15    to be?

16              GENERAL CROUCH:   The interview is about 40

17    minutes.  Can we try your computer?

18              AGENT CRAIG:      I've got a copy.  I can

19    play it on mine.

20              GENERAL CROUCH:   If we connect this line to

21    this computer, will it mess up the Zoom?

22              THE COURT:        Probably.

23              (Voices in background).

24              UNIDENTIFIED MALE:   You could probably do

25    it and run it through the sound system here.  Those late
```

Exhibit 1 - Crouch MTD Memo          96

1   hours of playing video games and you didn't pick up on

2   that?

3                   (Voices in background).

4                   THE COURT:      If nothing else, we can

5   put it in front of the microphone and then it will -- it

6   can pick it up that way.  Mr. Ethridge, can you go ahead

7   and pull the full screen projector down there?

8                   MR. ETHRIDGE:    Yes.

9                   (Whereupon, an audio recording is played in

10  open court for all to hear).

11                  AGENT CRAIG:     Okay.  I've got it.

12                  GENERAL CROUCH:  Mr. Lockert, can you hear

13  this?

14                  (Voices in background).

15                  THE COURT:      I can hear it.  I don't

16  think Mr. Lockert can hear it, though.

17                  MR. LOCKERT:     Can you connect it to one

18  of the microphones?

19                  GENERAL CROUCH:  It is.

20                  THE COURT:      It's connected to one of

21  the microphones, Mr. Lockert.

22                  (Voices in background).

23                  MR. LOCKERT:     The witness microphone

24  might be better.

25                  AGENT CRAIG:     Your Honor, I guess I can

Exhibit 1 - Crouch MTD Memo    97

 1  take it with me back to my microphone.

 2              THE COURT:      You can try that.

 3              (Whereupon, an audio recording is played in

 4  open court for all to hear).

 5              GENERAL CROUCH:   Can you hear it,

 6  Mr. Lockert?

 7              MR. LOCKERT:     No.  (Inaudible).

 8              GENERAL CROUCH:   Pause it.  I'll just ask

 9  questions.

10              (Whereupon, the audi recording is paused).

11  **BY GENERAL CROUCH:**

12     Q.  All right.  So, Mr. -- Agent Craig, we're having

13  some technical difficulties.  So instead of playing the

14  video, I'm going to ask you some questions about the

15  interview --

16     A.  Yes, sir.

17     Q.  -- and you can testify to the best of your

18  recollection.  First, did you Mirandize Mr. Garton?

19     A.  No, sir.

20     Q.  Why is that?

21     A.  He was not in custody.

22     Q.  Okay.  And how did you begin the interview?

23     A.  I identified myself.  Showed him my credentials.

24  Identified Special Agent Andy Vallee as well.  And

25  basically began asking him questions about the

Exhibit 1 - Crouch MTD Memo          98

1  situation.  He immediately stated, which he said to me

2  in the lobby, that the photoshopping is not a crime, and

3  I concurred with him.

4      Q.  Okay.  I think everybody agreed in this case that

5  the act of photoshopping is not illegal unless you're

6  violating some patent or trade or infringement agreement

7  or something like that.  I mean, there can be some

8  copyright laws, but in this case that was not happening.

9      A.  That's correct.

10     Q.  The actual act of posting or photoshopping Daniel

11 Baker's image onto a tombstone, that was not illegal?

12     A.  It was not illegal and I told him many, many

13 times that I concurred with that, that it was not a

14 violation of the law.

15     Q.  Okay.  Did you and Agent Vallee start asking some

16 questions to determine who Joseph Callaway is or was?

17     A.  Yes.

18     Q.  What did Garton initially tell you about

19 Callaway?

20     A.  That he was an individual that he had met in

21 Dickson at the Speedway gas station and that he sold him

22 the cell phone with a number attached and that he

23 currently lived in Nevada.

24     Q.  So in the initial statements of the interview, he

25 claimed that Callaway lived in Nevada?

Exhibit 1 - Crouch MTD Memo    99

1    A.   Yes.

2    Q.   Eventually, did he acknowledge that he was

3  Callaway?

4    A.   He did.

5    Q.   All right.  Did you ask him about the intent or

6  reasoning for posting this image to Facebook?

7    A.   Yes.  I asked -- I just asked for -- if he could

8  give me an explanation and explain to me what the

9  purpose was for doing this.

10   Q.   And what was his response?

11   A.   He said that he just had some trouble with law

12 enforcement and that it was just something that

13 happened.  And I remember responding to him, you let

14 your emotions get the best of you, and he said yes.

15   Q.   Did he say anything about being banned from

16 Facebook?

17   A.   He did.

18   Q.   What did he say?

19   A.   He said one of the reasons he did this was to get

20 Facebook to ban him.  To cause enough, I guess, concern

21 about the post itself that they would take action

22 against him and ban him.

23   Q.   Okay.  At 14 hours 15 minutes and 16 seconds, did

24 he say, "I'm just trying to sell my stuff on Facebook

25 and I'm gone"?

Exhibit 1 - Crouch MTD Memo    100

 1    A.  He did.

 2    Q.  And what stuff was he referring to?

 3    A.  He -- he used -- he stated that he used the

 4  Joseph Callaway identity for market, which was Facebook

 5  Marketplace, and that he had had that -- that alias and

 6  an established profile for a few months and that he was

 7  using it to sell some of his items.

 8    Q.  And on January 22nd, was he trying to sell his

 9  bed?

10    A.  That's what he had listed, yes.

11    Q.  Where did he say he was going?

12    A.  Kentucky.

13    Q.  Said he was going to take a tiny house up there?

14    A.  He said that he was in the process of building a

15  tiny house and that he was going to move the tiny house

16  to Kentucky.

17    Q.  Okay.  And he had -- did he have his bed actually

18  loaded up in the truck?

19    A.  He did.

20    Q.  Did you see it?

21    A.  I did.

22    Q.  Was it your impression conversating or having

23  this conversation with Mr. Garton, that he was about to

24  go to Kentucky?

25    A.  Yes, absolutely.

Exhibit 1 - Crouch MTD Memo    101

1    Q.   Now, I have noted it 14:14:44 he stated, "I'm

2   trying to get banned from Facebook".

3    A.   Yes.

4    Q.   Did he say that?

5    A.   He said that I was trying -- he was trying to get

6   banned from Facebook.  And I responded to him, "well,

7   you can just do that yourself by logging off."

8    Q.   When he said "I'm trying to get banned," he --

9   the intent was "I posted this trying to get banned"?

10    A.   That's what he said.

11    Q.   Did you go into any conversations with him to any

12   detail as to how he created it or anything like that?

13    A.   No.  Other than he stated that it came from a --

14   the back of a CD, I believe, a music song that the image

15   came off of.  And I asked him how he was able to -- did

16   he know Daniel?  And he stated he did not.  Knew of him

17   from being in Dickson.  And I said, "well, how were you

18   able to put the image of his face on the tombstone?"  He

19   said he Googled it and it came up.

20    Q.   All right.  He denied knowing anybody in the

21   Baker family; is that correct?

22    A.   Yes, that's correct.

23    Q.   Now, as you're interviewing Garton, had you been

24   receiving other information about the posting and

25   private messages between Garton and third persons?

Exhibit 1 - Crouch MTD Memo    102

1    A.  Well, I may have received something during that

2  interview, but I had already had that information --

3    Q.  You already --

4    A.  -- prior to sitting down with Mr. Garton.

5    Q.  So you were kind of equipped to do this interview

6  with him based on information you'd already received?

7    A.  That's correct.

8    Q.  So when he started talking about not being

9  Callaway and all this stuff, you knew he was lying?

10    A.  I did.  I knew he wasn't telling the truth when

11  he said he's not -- not Callaway.

12    Q.  Yes.

13            GENERAL CROUCH:  All right.  I'll pass the

14  witness.

15            THE COURT:      Mr. Lockert, questions?  I

16  think your mic may be muted out.

17            MR. LOCKERT:    I'm sorry.

18  **CROSS EXAMINATION**

19  **BY MR. LOCKERT:**

20    Q.  Agent Craig, what information did you have from

21  the conversation that Mr. Bailey, the retired officer,

22  had had with Mr. Garton when you interviewed Mr. Garton?

23    A.  What I had was a thread of communication that

24  Mr. Bailey had sent to the Dickson Police Department and

25  they forwarded it to me and that there was communication

Exhibit 1 - Crouch MTD Memo    103

1    that he referenced Lisa, Daniel's wife, in the

2    communication.

3       Q.   All right.  And Mr. Bailey wasn't technically an

4    officer, but he was questioning the suspect and relaying

5    the information to Officer Arnold and who else?

6       A.   As far as my -- as far as I know, that it was

7    only Captain Arnold that was receiving it from

8    Mr. Bailey.

9       Q.   Okay.  And when you talked to Mr. Garton, what

10   crimes were you investigating?

11      A.   The crime of harassment.

12      Q.   And at the time you talked to him based on the

13   information you already had, did you already have the

14   information that it was him who sent -- I mean, who

15   posted the meme?

16      A.   The information I had, I had a driver's license

17   photo that was basically -- it was an image of -- it was

18   a picture of Joshua Garton and that the officers or the

19   Dickson Police Department had sent it.  And word on the

20   internet was coming out that this, in fact, was Joseph

21   Callaway.  And then when I walked in the lobby and I

22   looked at Mr. Garton, it was the same image that was put

23   on social media identifying Joseph Callaway as actually

24   Joshua Garton.

25      Q.   So you did originally believe he was the one who

Exhibit 1 - Crouch MTD Memo        104

1  posted that meme?

2      A.   That's correct.  You know, reasoning is a good

3  word.   Until I was able to sit down with him and talk to

4  him to verify a hundred percent, but I felt comfortable

5  that the individual in the lobby was, in fact, Joseph

6  Callaway.

7      Q.   And he being the person who posted the meme?

8      A.   Yes.

9      Q.   Certainly, your investigation had centered on him

10  as being the suspect in what you believed to be

11  harassment?

12      A.   Once the identity of Callaway was transitioned to

13  Joseph Garton, I felt pretty sure that he was the one

14  that posted it and that he would be the one that we

15  would look to as possibly violating the statute of

16  harassment.

17      Q.   And was he, in fact, arrested for that charge?

18      A.   He was.

19      Q.   And when did that happen?

20      A.   After the interview.  Approximately probably

21  3:30, 3 o'clock on the 21st, or 22nd rather.

22      Q.   If you knew that that was him, he wasn't leaving;

23  is that correct?

24      A.   If I knew that was him, he wasn't leaving?  No.

25  I didn't know I was going to arrest him until after I

Exhibit 1 - Crouch MTD Memo      105

1   completed the interview with him and based it on the

2   evidence that he provided and what I had obtained.

3       Q.  Did you receive any -- any direction in regard to

4   what to charge him with from Officer Arnold?

5       A.  No, sir.

6       Q.  Did you receive any direction in regard to what

7   the charges may be from anyone in the D.A.'s office?

8       A.  Yes.

9       Q.  And did you review the harassment statute itself?

10      A.  I did, sir, yes.

11      Q.  If Mr. Garton believed that law enforcement

12  officers are corrupt, D.A.s are corrupt, judges are

13  corrupt, and that he was going to wage a war using memes

14  on social media, would you consider that to be a lawful

15  purpose?

16      A.  A lawful purpose.  It was not an unlawful

17  purpose.

18      Q.  Not an unlawful purpose?

19      A.  Correct.

20      Q.  All right.  So the first section of the

21  harassment statute says "when the defendant communicated

22  with another without lawful purpose."  His post and that

23  meme on his Facebook page that was private and not open

24  to the public, that would not be an unlawful purpose,

25  would it?

Exhibit 1 - Crouch MTD Memo    106

1     A.   I think that the -- the posting itself was kind

2  of a means to an end.  Putting it out there was just to

3  arouse emotion.  And, of course, we all knew that's what

4  had happened.  The triggering of the harassment statute,

5  in my opinion, was based on the direct communication

6  that he focused on with Lisa Baker and the Dickson

7  County law enforcement officers.

8     Q.   I'll ask you again.  His posting a meme, whether

9  it's derogatory or (inaudible) or photoshop, someone

10 peeing on a photo of an officer, you're not saying

11 that's an unlawful purpose, are you?

12    A.   No, sir.

13    Q.   And, in fact, people post those type things all

14 the time.

15    A.   They do.

16    Q.   Now, I know they're offensive, but a social meme

17 where somebody has photographed an officer -- a

18 motorcycle officer who is either injured or dead on the

19 side of the road and they post a meme that says, "go

20 home, officer, you're drunk," that's terribly

21 inappropriate, isn't it?

22    A.   It is.

23    Q.   But it's not unlawful, is it?

24    A.   No, sir, it's not.

25    Q.   Based on your investigation, did Mr. Garton take

Exhibit 1 - Crouch MTD Memo    107

1  any steps to send this meme to any of Officer Baker's

2  family?

3  　　A.　He did not directly send it to the family.　It

4  was provided to them through a third party.

5  　　Q.　And based on your information, did he commit

6  third parties to send anything to the Bakers?

7  　　A.　No.

8  　　Q.　He did not post it on social media open to all

9  the public either, did he?

10 　　A.　I don't believe he did.　I'm not aware of how

11 many people it actually reached and who he had -- had

12 access to his -- his post.

13 　　Q.　So if his page was private and only shared by his

14 friends and none of those friends were the Bakers or

15 their families, then someone else would have to

16 disseminate that to the Bakers and/or their family?

17 　　A.　Yes, sir.

18 　　Q.　I assume you're not going to charge those people,

19 are you?

20 　　A.　For disseminating it and providing --

21 　　Q.　Yeah.

22 　　A.　I think it goes -- it would go to their intent.

23 They're providing it to them as a courtesy to show them

24 -- to show the Baker family what -- what that post was,

25 to bring it to their attention.　Not to -- not for them

Exhibit 1 - Crouch MTD Memo    108

1    to elicit some kind of emotional response.

2        Q.   If he posted it on his page, which is private and

3    not open to the public, and he doesn't direct anyone to

4    share it with the Baker family, then what evidence do

5    you have that it was his intent that what he posted on

6    his private page would be sent to the Bakers?

7        A.   I think that -- that his intent was solely to

8    affect the community, especially the law enforcement

9    community, the Dickson police officers, but also

10   specifically by referencing Lisa Baker and her daughter,

11   that he knew who they were.  And initially he told me he

12   didn't know who they were.  So I think there is a

13   connection there that he had.

14       Q.   Again, I'll ask you what evidence -- not what you

15   think -- what evidence is there that (inaudible) that

16   shows his intent was that meme be sent to the Bakers?

17       A.   The evidence that I believe exists is when he

18   communicated with Jonathan Bailey that Lisa Baker would

19   be next.

20       Q.   He told him he was going to post memes about a

21   lot more officers and family and he considered them all

22   to be treasonous.  That's talking about what he's going

23   to do.  I'm talking about this meme.  What evidence do

24   you have that he intended this meme to be sent to Lisa

25   Baker or her family?

Exhibit 1 - Crouch MTD Memo   109

1    A.   Again, I think this meme, again, is not a

2  violation of the law but it was a means to an end for

3  him to get to Lisa Baker.  And he -- by knowing who she

4  was by name shows that.  And using a third party to help

5  facilitate that.

6    Q.   How did he use a third party?  Did he direct a

7  third party to do that?

8    A.   I think he knew -- I think it's common sense that

9  based on the subject matter --

10    Q.   I'm not asking for your opinion.  I'm asking you

11  what evidence do you have that he directed or asked a

12  third party to relay this meme to the Baker family?

13    A.   By communicating to Jonathan Bailey is my answer.

14    Q.   Jonathan Bailey asked him about it, right?

15    A.   He volunteered -- he brought up Lisa Baker.  He

16  just -- Jonathan brought up the family, but he brought

17  up her name specifically.

18    Q.   All right.  And indicated he was going to post a

19  meme about her too?  Right?

20    A.   Yeah.

21    Q.   And go post memes about other law enforcement

22  officers.  He had just barely got started.

23    A.   That's correct.

24    Q.   Well, we've already established that it's not

25  unlawful for him to post memes like this about law

Exhibit 1 - Crouch MTD Memo    110

1   enforcement or judges or their families as long as he's

2   not threatening to hurt them, right?

3      A.   That's correct.

4      Q.   I mean, he could post a meme of Mrs. Baker and

5   say she's treasonous just like the cops?

6      A.   And then it would --

7      Q.   (Inaudible).

8      A.   Well, it would depend on how Mrs. Baker would

9   feel as far as what that -- what that -- how that would

10  affect her by seeing that and by calling her treasonous.

11  Was it annoying?

12     Q.   What the statute says is that it's the

13  defendant's intent, not how somebody takes it, right?

14     A.   No, that's not correct.

15     Q.   "That the defendant -- that the defendant

16  intended that the frequency or means of the

17  communication annoy, offend, alarm, or frighten the

18  recipient."

19     A.   That's correct.

20     Q.   What is the evidence that you have that his

21  posting this meme on his private page was intended to

22  harm or frighten Mrs. Baker?

23     A.   By singling out Lisa Baker as a target for that

24  post.

25     Q.   Was she singled out as a target for that post?

Exhibit 1 - Crouch MTD Memo     111

1    A.   He's the one that brought her name up.

2    Q.   Was she singled out as a target on that post?

3    A.   He -- he sent it to -- he sent it out to his --

4    privately, but once it was disseminated publicly, Lisa

5    was notified and she stated how it made her feel and how

6    she was scared based on that.  And then, he, in turn --

7    Q.   Did Mr. Garton notify her?

8    A.   No, sir.  And then, in turn, Mr. Bailey notified

9    her based on Mr. Garton's communication.

10    Q.   Did Mr. Garton ask Mr. Bailey to notify her?

11    A.   No, he did not.

12    Q.   Did he take any steps of any kind that asked

13    anyone to send that to Mrs. Baker?

14    A.   He did not.

15    Q.   So if he -- if he published it on his private

16    page and he didn't ask anybody to send it to her, he

17    didn't direct anybody to send it to her, then how can

18    you say that it was his intent that she get it?

19    A.   I think after talking to Mr. Garton and then

20    looking at the thread, I think that he -- he understood

21    that this would eventually get to Mrs. Baker.

22    Q.   What evidence do you have?  I'm not talking about

23    what you think.

24    A.   I understand that.  I understand that, but I -- I

25    answered the question based on Jonathan Bailey taking

Exhibit 1 - Crouch MTD Memo     112

1    that information and forwarding it to Lisa Baker and him

2    being concerned about it and in turn forwarding it to

3    Captain Donny Arnold.  So there was some concern there

4    based on that comment that Joshua Garton made.

5        Q.  That's a private conversation with Mr. Bailey,

6    right?

7        A.  Just those two, between Joshua and Mr. Bailey,

8    that's correct.

9        Q.  And Mr. Garton didn't ask Mr. Bailey to

10   disseminate that to anyone?

11       A.  No, sir, he did not.

12       Q.  So in all of your investigation, who actually

13   disseminated this meme to the Baker family?

14       A.  I don't know who all disseminated it to them.

15   There's probably numerous individuals.

16       Q.  But it wasn't Mr. Garton, was it?

17       A.  No, it was not Mr. Garton.

18       Q.  And he could have tagged Lisa Baker on the post,

19   couldn't he?

20       A.  That, I don't know.

21       Q.  Do you do Facebook?

22       A.  No, sir, I do not.  Now you know why.

23       Q.  Based on your investigation, did he tag Lisa

24   Baker so that it would show up on her page?

25       A.  No, sir, he did not.

Exhibit 1 - Crouch MTD Memo    113

1    Q.  Did he send it in an instant message by Facebook

2    to Lisa Baker so that she would see the meme?

3    A.  No, sir, he did not.

4    Q.  Did he ask anyone to forward that to Lisa Baker?

5    A.  No.

6    Q.  So you're saying that even if it's a lawful

7    purpose and you can trash cops and families with memes,

8    it depends on what that person thinks when they get it?

9    A.  I think the statute talks about whatever the

10   individual -- how it -- how it affects them.  It's such

11   -- it's like a phone call at two in the morning, prank

12   phone call from the seventies and eighties, when you

13   tell someone whose child is dead and you called to speak

14   to their child and you repeat that call over and over

15   again.  That's harassment.  It's the same thing.

16   Q.  All right.  And in this case, Mr. Garton only

17   posted this meme one time?

18   A.  That, I'm not a hundred percent sure of, but it

19   appears he only posted it one time.

20   Q.  And if he made statements that he posted it

21   elsewhere, y'all have not found this meme posted

22   anywhere other than that one Facebook page?

23   A.  That's correct.

24   Q.  And you have no evidence that he asked anyone

25   else to re-post or forward it to the Baker family?

Exhibit 1 - Crouch MTD Memo     114

1     A.   That's correct.

2     Q.   Are you aware that hate speech is protected under

3    the constitution?

4     A.   Yes, I am.

5     Q.   And you're aware that there are three categories

6    where it can cross the line if a person makes an actual

7    threat?

8     A.   Yes.

9     Q.   Or if a person tries to insight lawless action?

10     A.   Yes, sir.

11     Q.   Someone -- someone stands in your face and tries

12    to get you to fight?

13     A.   Yes, sir.

14     Q.   Mr. Garton didn't ask anyone to do anything

15    unlawful, did he?

16     A.   He did not.

17     Q.   Did he confront the Bakers and ask them to fight?

18     A.   No, sir.

19     Q.   Did he make any threats other than posting

20    additional memes attacking cops, D.A.s, judges, and

21    cops' families?

22     A.   He made reference to what should happen to

23    individuals that he deemed as being treasonous.

24     Q.   Did he ask -- he asked a retired officer what

25    should happen to people who commit treason?

Exhibit 1 - Crouch MTD Memo    115

1    A.   That's correct.

2    Q.   And he told him that he was going to continue his

3  war of posting memes?

4    A.   He did.

5    Q.   Isn't it true that no matter how inappropriate or

6  offensive speech is, it's protected?

7    A.   Under certain -- under certain conditions, and

8  you -- you mentioned that earlier.

9    Q.   And you're familiar with the -- the -- that

10  organization of the Woodmont {sic} Baptist Church that

11  goes to soldiers' funerals and calls them fags and calls

12  their families fags and posts all kinds of derogatory

13  signs and those type things.  Your familiar with that,

14  aren't you?

15    A.   Yes, sir.

16    Q.   And the Court has said that's protected speech.

17  So why is this meme not protected speech?

18         GENERAL CROUCH:   Judge, I'm going to

19  object.  He's asking Agent Craig to provide a legal

20  answer about the constitutional interpretation of a

21  state statute, which in order to ask him that question,

22  you would actually have to read the Tennessee Code which

23  prevents people from picketing and holding signs and

24  yelling at people that are near grave sites and during

25  funerals.  They have to be ex number of feet away.  So,

Exhibit 1 - Crouch MTD Memo    116

1    yes, there is that constitutional holding, but there is

2    also a criminal law in Tennessee to prevent people from

3    doing exactly what Mr. Lockert is talking about.

4              MR. LOCKERT:    Just one last question.

5    **BY MR. LOCKERT:**

6      Q.  You agree, though, that his posting these type

7    memes is a lawful purpose?

8      A.  The post of urinating on the grave was lawful.

9      Q.  Yes.

10             MR. LOCKERT:    That's all the questions I

11   have.

12   <u>**REDIRECT EXAMINATION**</u>

13   <u>**BY GENERAL CROUCH:**</u>

14     Q.  Agent Craig, we have -- when Mr. Lockert asked

15   you about the intent and whether the Facebook profile

16   had been made public or not -- I'm going to show you a

17   copy of Mr. Callaway's Facebook posting.  Can you

18   identify this?

19     A.  Yes.  That is -- that's the image that was posted

20   on the morning of the 22nd of two individuals urinating

21   on a headstone with Daniel Baker's image on it.

22     Q.  So Mr. Callaway, who is Mr. Garton, has actually

23   -- it's not just a posting.  He's actually created a

24   hashtag.

25     A.  Yes.

Exhibit 1 - Crouch MTD Memo    117

1    Q.   And what's the hashtag say?

2    A.   Dickson County Police Department.

3    Q.   Now, you've already testified you're not a

4  Facebook user, but did you know that creating a hashtag

5  on Facebook actually does something?

6    A.   Yes.

7    Q.   What does it do?

8    A.   It forwards it.  It notifies people that are tied

9  to Dickson County police, all those markings, it will

10 send that to them.

11   Q.   Now, we don't know for sure whether or not --

12 when -- when Mr. Callaway's profile went back to being

13 private.  Mr. Lockert is just assuming through questions

14 that it was always a private Facebook page.  Do you

15 know?

16   A.   I do not know.  And as for the private and

17 public, I'm not aware.  And I think it would have been

18 private for a while.  But I know when you use

19 marketplace, you have to open it up publicly so people

20 can respond to you.

21   Q.   And he was using marketplace?

22   A.   That's correct.

23   Q.   Now, we also did actually have some evidence,

24 which has already been exhibit -- entered as evidence as

25 Exhibit 1.  And I'm going to refer you to Exhibit 1,

Exhibit 1 - Crouch MTD Memo    118

1    page 36.

2              GENERAL CROUCH:   And before I do that, I'm

3    going to move this photo as Exhibit Number 2.

4              (Exhibit No. 2 marked and filed).

5    **BY GENERAL CROUCH:**

6       Q.   And that's the photo of Callaway's Facebook page

7    and the hashtag.   Now, referring to Exhibit 1, page 36,

8    Joseph Callaway says, "trust me" -- do you see that

9    paragraph?

10      A.   Yes.

11      Q.   What's he say?

12      A.   "Trust me, I did it.   I didn't just upload it to

13   Facebook.   I uploaded it to a lot of websites."

14      Q.   So he didn't just simply post it on his Facebook

15   page.   He says, "I posted it to Facebook and a lot of

16   websites."

17      A.   Yes.

18      Q.   What intent does that show?

19      A.   That he was looking for a large audience.

20      Q.   And let me ask you this:   If you are trying to

21   mail me a letter, do you put a stamp on it?

22      A.   Yes.

23      Q.   Do you deliver it --

24      A.   No.

25      Q.   -- personally to my house?

Exhibit 1 - Crouch MTD Memo    119

1    A.   No, sir.

2    Q.   How does it get to me?

3    A.   It's addressed, stamped, and placed with the

4    postal service for delivery.

5    Q.   And then the postman or whoever is delivering the

6    mail takes it to my house?

7    A.   Yes, sir.

8    Q.   And that's a third party delivering a message?

9    A.   Yes.

10    Q.   I mean, similarly in this case we have his intent

11    to distribute because he says it.  I uploaded it to

12    Facebook and a lot of websites, correct?

13    A.   Yes.

14    Q.   And it was distributed, correct?

15    A.   Yes.

16    Q.   With a hashtag on it?

17    A.   Correct.

18    Q.   The address of who his audience is?

19    A.   Yes.

20    Q.   Let's look at some above -- some of

21    Mr. Callaway's -- Mr. Garton's statements to you.  On

22    the profile page, Exhibit Number 2, he held himself up

23    to be an employee of DSW Construction; is that right?

24    A.   Yes, that's correct.

25    Q.   And was he an employee of DSW Construction?

Exhibit 1 - Crouch MTD Memo   120

1      A.   No, sir, he was not.

2      Q.   That was a lie.

3      A.   Yes, sir.

4      Q.   And by holding himself out and linking DSW's

5  company information, website, Facebook, phone number,

6  what happened?

7      A.   The construction company received a litany of

8  complaints from the citizens in the community.

9      Q.   And did you interview the owner of the

10  construction company?

11      A.   Yes, sir, I did.

12      Q.   Did he have any clue who Joshua Garton is?

13      A.   No, he did not.  Or Joseph Callaway.

14      Q.   He had no idea?

15      A.   No.

16      Q.   Did his company receive a lot of negative

17  backlash?

18      A.   He did.

19      Q.   In fact, you did a download of all of the

20  information -- negative backlash to DWS -- DWC

21  Construction Company received; is that correct?

22      A.   They provided me digital copies of those

23  documents, yes.

24      Q.   I ask you to identify those documents.

25      A.   Yes.  This is what DWC provided me based on the

Exhibit 1 - Crouch MTD Memo    121

1  comments and communication they received as a result of

2  the post.

3  Q.  I mean, people -- Joseph Callaway's Facebook

4  page, Garton's anonymous fake page, hashtagged Dickson

5  County law enforcement and had a link directly to an

6  employee -- a company that he didn't work for, right?

7  A.  Yes.

8  Q.  And as a result, this company received a stack

9  load of complaints and phone calls and Facebook

10 messages?

11 A.  That's correct.

12            GENERAL CROUCH:    Move that as Exhibit 3.

13            THE COURT:         Any objection?

14            MR. LOCKERT:       (No audible response).

15            (Exhibit No. 3 marked and filed).

16 **BY GENERAL CROUCH:**

17 Q.  Now, Mr. Lockert was asking you about the actual

18 statute.  And the definitions of the statute under

19 communicate says, "means -- means contacting a person in

20 writing, print, telephone, wire, radio,

21 electromagnetic" -- I can't say some of these words --

22 "and includes text messages, facsimile transmission,

23 electronic mail, instant message, messages, images,

24 videos, sound recordings, or intelligence of any nature

25 sent through or posted -- or posted on social media

Exhibit 1 - Crouch MTD Memo      122

1   networks."

2       A.   That's correct.

3       Q.   And that's the actual statute.

4       A.   That's the statute that we looked at.

5       Q.   And that's what Garton did?

6       A.   Yes.

7       Q.   He posted on a social media network?

8       A.   He did.

9       Q.   All right.  With a hashtag?

10      A.   Yes.

11      Q.   And uploaded to many websites?

12      A.   That's what he said he did.

13      Q.   What is the point of posting something on

14  Facebook if you're not trying to communicate?

15      A.   I don't -- I wouldn't have an answer to that.

16      Q.   I mean, is there any other objective?

17      A.   No.

18      Q.   I mean, it's social media --

19      A.   "To espouse an opinion or to communicate a

20  belief, opinion, or thought to an individual or masses."

21      Q.   I mean, a social network Facebook is for

22  communication.

23      A.   Yes, it is.

24           GENERAL CROUCH:   Pass the witness.

25  **RECROSS EXAMINATION**

Exhibit 1 - Crouch MTD Memo    123

**BY MR. LOCKERT:**

1

2    Q.   And at the time he communicated or posted this

3    meme, you've already testified that that was not an

4    unlawful purpose?

5    A.   When he -- when he posted that meme, that's

6    correct, it was not an unlawful purpose for posting that

7    meme.

8    Q.   And he didn't hashtag anybody in the Baker

9    family?

10    A.   No, sir.

11    Q.   If he's trying to directly communicate just to

12    Lisa Baker or Daniel Baker's mom, what would be the best

13    way for him to do that?

14    A.   I don't know how he -- he would have any types of

15    communications with the Baker family because -- I guess

16    he could try to locate them on Facebook and then send

17    them the message.

18    Q.   He could send them a Facebook message with the

19    meme attached, right?

20    A.   He could.

21    Q.   He could hashtag the family instead of the police

22    department?

23    A.   Yes, sir.

24    Q.   He could have printed the meme and mailed it to

25    the Bakers?

Exhibit 1 - Crouch MTD Memo     124

1    A.  Yes, sir.

2    Q.  He could have called them and told them go look

3  at my private page and I will accept you as a friend so

4  you can see it?

5    A.  Yes, sir.

6    Q.  He could have published it in the newspaper if

7  they let him put it in there?

8    A.  Pretty much what he did when he puts it on

9  Facebook, the same effect as a newspaper.

10   Q.  He could have directed third parties to show the

11 meme to the Baker family.  And we have no evidence that

12 he directed anybody to share it with the Bakers, right?

13   A.  That's correct.

14   Q.  No evidence that he hashtagged any of the Bakers?

15   A.  Correct.

16   Q.  No -- that he attached the meme to instant

17 messages and sent it to any of the Baker family?

18   A.  Yes, sir.

19   Q.  Correct?

20   A.  Yes, sir.

21   Q.  And at the time he posted it, you acknowledge

22 that it was for a lawful purpose?

23   A.  At the time he posted it, it was not illegal.

24        MR. LOCKERT:     That's all the questions I

25 have.

Exhibit 1 - Crouch MTD Memo     125

1          THE COURT:        General Crouch, anything
2    further?
3          GENERAL CROUCH:    (No audible response).
4          THE COURT:        Thank you, Agent Craig.
5    You can step down.
6          MR. LOCKERT:      One more question.
7          THE COURT:        Go ahead.
8    **BY MR. LOCKERT:**
9      Q.  Agent Craig, do you know how the bond got to be
10   $76,000?
11     A.  I believe it was based on the Kentucky comments
12   that he made, that he was possibly going to flee -- flee
13   the state.
14     Q.  Were those comments relayed to a magistrate or
15   judge?
16     A.  No, not the magistrate or the -- no, I take that
17   back.  I did discuss that, I believe, with the
18   magistrate, yes.
19     Q.  Did anyone discuss setting the bond at that
20   amount with the magistrate?
21     A.  I did not.
22     Q.  Are you aware of anyone discussing setting it at
23   that amount with the magistrate?
24     A.  I have not.  She came in and had the bond.  I
25   asked what the bond was and she said 76,000.

Exhibit 1 - Crouch MTD Memo    126

1          MR. LOCKERT:     That's all the questions I

2    have.

3          THE COURT:      General Crouch, anything?

4          GENERAL CROUCH:  No, sir.

5          THE COURT:      Okay.  Thank you, Agent

6    Craig.  You may step down.

7          Is that the State's proof?

8          GENERAL CROUCH:  Yes, sir.

9          THE COURT:      All right.  The State

10   rests.  Mr. Lockert, any witnesses you wish to call?

11         MR. LOCKERT:     No, Your Honor.

12         THE COURT:      Okay.  All right.

13   General, do you wish to make argument?

14         GENERAL CROUCH:  Just briefly, Judge.

15         Judge, I know that Your Honor is familiar

16   with case law, more knowledgeable than I am, but I

17   wanted to briefly talk about, since it's the defendant's

18   defense in this case, the First Amendment.

19         Quoting quotes from a Tennessee case, State

20   v. Goldberg.  "The right of free speech is not absolute

21   at all times and under all circumstances.  We are not

22   free to harm others under the guise of free speech.  As

23   speech strays further from the values of persuasion,

24   dialogue, and free exchange of ideas and moves toward

25   willful threats to perform illegal acts, the State has

Exhibit 1 - Crouch MTD Memo    127

1    greater latitude to regulate its (inaudible)."

2        "Exceptions," as Mr. Lockert has already

3    mentioned, "include obscenity, libel, fighting words,

4    which by their very utterance inflict injury or intent

5    to incite or intimidate the breach of peace, but there

6    are some more areas that are -- that are not protected

7    languages."

8        "The United States Supreme Court has

9    rejected the contention that constitutional freedom of

10   speech impress extends to immunity to speech or writing

11   used as an integral part of conduct in violation of a

12   criminal statute."

13       You can't use the First Amendment as a

14   defense when you're committing a crime.  When speech

15   itself is the conduct of crime, it's not protected by

16   the First Amendment.  Free speech, going back to

17   Gonzalez, does not include the right to cause

18   substantial or emotional distress by harassment or

19   intimidation.

20       And it is absolutely clear, not only from

21   case law but from this case that Joseph Garton,

22   pretending to be Joseph Callaway, intended and did in

23   fact cause emotional stress, harassment, and

24   intimidation, fear to the victims.  Case goes on to say

25   that the defendant had no constitutional right to engage

Exhibit 1 - Crouch MTD Memo    128

1  in conduct intended only to inconvenience and annoy.

2         And in this particular case in Gonzalez, the

3  defendant was observing the police issuing a traffic

4  citation.  That alone was enough for this Court to say

5  that the police can regulate his activity of observing

6  them issue a citation.  In this case we have a man

7  saying that every person with a badge on is an enemy and

8  that he is going to war.  I want war.  Peace comes with

9  war.  I mean, it's his own words.  He is stating his

10 intent.  His intent is to continue on.

11        Also, the court of appeals concluded that

12 the repeated posting, videos, and written content was

13 clearly meant to harass, degrade, intimidate, threaten,

14 and humiliate.  This posting alone, as Agent Craig

15 testified to, may or may not be free speech.  I would

16 say it's free speech just to post a bond.  I would say

17 it's protected under the First Amendment.  Just looking

18 at the posted bond.

19        But when you look at defendant's intent and

20 his stated intent that you've got to have war to get to

21 peace, that all police are the enemy, and that Daniel

22 Baker is a traitor and committed treason and so has Lisa

23 Baker, that takes it to another level.  And that's what

24 Agent Craig was getting to, it's the combination of the

25 two.  Had there just been the post, that's horrible, but

Exhibit 1 - Crouch MTD Memo    129

1   okay.  Nobody would be charged.  But in this case, you

2   have a combination and the defendant has expressed his

3   intent clearly.

4          Let me go over to United States v. Gonzalez,

5   and the Court addresses two classes of speech.  One,

6   "defamatory statements are not protected by the First

7   Amendment, reasoning that the resort to epithets or

8   personal abuse is not in any proper sense communication

9   of information or opinion safeguarded by the

10  Constitution."

11         The defendant in this case has made direct

12  defamatory statements towards Lisa Baker and towards her

13  family by calling someone a traitor or that someone has

14  committed treason.  Those are defamatory statements that

15  are not protected under the Constitution.

16         In Gonzalez -- excuse me -- yes, in Gonzalez

17  they continue on again to say that in the second

18  protected -- unprotected class, speech, integral to

19  engaging criminal conduct does not warrant First

20  Amendment protection.  And in the Gonzalez case, what

21  happened is there is multiple postings and issues that

22  went out to third parties and the Court ruled that "it's

23  not simply statements expressing their beliefs that

24  statements were sent to Belford, the children, and third

25  parties -- and third parties as an extensive and

Exhibit 1 - Crouch MTD Memo    130

1  successful campaign to threaten, intimidate, and harass

2  Belford."

3          So Mr. Lockert is saying that, well, it

4  wasn't sent directly to Lisa Baker.  Well, it doesn't

5  have to be sent directly to Lisa Baker.  It's the

6  intent.  The intent is to harass.  He says it.  We have

7  45 pages of the defendant telling the world that he

8  wants to harass.  That that is his goal.  His sole goal

9  is to harass and intimidate.  I mean, it couldn't be

10  more clearer than that.

11          Finally, Your Honor, in the interpretations

12  of the statute, I've already read through Agent Craig

13  one of the definitions of the word "communicate" in the

14  statute and "social network," which under number 5

15  social network means "any online community of people who

16  share interests and activities or who are interested in

17  exploring the interests and activities of others, which

18  provides a way for users to interact."

19          Well, that's what happened.  Mrs. Baker, her

20  family, members of law enforcement are members of this

21  social network.  The defendant posted to the membership

22  of this network and he put a hashtag on it.

23          Now, although I could not find any Tennessee

24  cases directly on point because this is somewhat an

25  issue of first impression, there is a federal court case

Exhibit 1 - Crouch MTD Memo    131

1  and a case out of Florida, O'Leary v. State, in which

2  that is exactly what we see.  And para -- quoting from

3  United States v. Presley, 2014 U.S. District, LEXIS

4  106438, in the case of O'Leary v. Florida is similar to

5  the (inaudible) case.  And what I'm getting to, is by

6  the affirmative act of posting the threats on Facebook.

7  Even though it was on his own personal page, the

8  defendant was found to have sent or transmitted the

9  threatening statements to all of his Facebook friends,

10  including the recipient.  Now, that's the federal court

11  case.

12        In the Florida case of O'Leary, it was same

13  -- same fact finders but it was sent to people, third

14  party recipients, who then forwarded it to the victim.

15  These are cases that make clear that you do not have to

16  have a direct transmission from the defendant to the

17  victim.  It's just like mailing a letter.  Nobody on

18  Earth would think that the postman is committing

19  harassment by delivering a letter that contains this

20  (inaudible).

21        If I get a letter -- and let me back up.  If

22  I get a letter with someone urinating on my father's

23  grave, yes, it's harassment.  My father has passed away.

24  It's -- but he died of natural causes.  This Court and

25  Mr. Lockert would never be able to understand the

Exhibit 1 - Crouch MTD Memo    132

1    subjectiveness of how the Bakers felt by seeing this

2    image and receiving it.  Because, to my knowledge, none

3    of us have lived through a spouse being murdered by

4    someone who hated the criminal justice system.  And here

5    you have this representation of someone who does hate

6    the criminal justice system who in his own writing is at

7    war with the criminal justice system and everybody who

8    wears a badge.  And then you receive this image of

9    someone urinating on your husband's grave.  The

10   combination of those two things is a direct threat.

11          You heard the testimony of the witnesses.

12   They were in fear, not to mention annoyed, harassed,

13   threatened, intimidated.  They were in fear.  This is

14   harassment.  Thank you.

15          THE COURT:       Argument, Mr. Lockert?

16          MR. LOCKERT:     Yes, sir, Your Honor.

17          First of all, the State through Agent Joe

18   Craig has acknowledged that this meme went -- as posted

19   was not for an unlawful purpose.  Therefore, the

20   harassment statute does not apply.  They're trying to

21   say that his conversation with a retired officer later

22   where he has threatened to post memes and photos about

23   Lisa Baker is harassment.

24          And I would submit that telling someone in a

25   private conversation that it is your intent to post more

Exhibit 1 - Crouch MTD Memo    133

1    memes about officers and the officer's wife, that is not

2    a crime.  That is simply discussing something that he

3    intends to do.  But by the State's own acknowledgement,

4    this meme was posted for a lawful person.  He's got

5    every right to criticize law enforcement.  He's got

6    rights under the law and the Constitution to use

7    offensive language.  You can post pictures of peeing on

8    cops.  You can post pictures of a motorcycle officer

9    laying down injured badly or dead and saying, "get up,

10   officer.  Go home.  You're drunk."  Those things are all

11   offensive, but they're lawful purposes.

12           TBI has acknowledged this meme was for a

13   lawful purpose.  If they think they've got some charges

14   based on what he told Mrs. Baker or what he told the

15   retired Officer Bailey, they did not (audio distortion)

16   that.  So I submit when the State's own witness

17   acknowledges that this meme was posted for a lawful

18   purpose, the Court has no choice but to dismiss it.

19           THE COURT:      All right.  Y'all give me

20   a couple of minutes to think this through, okay.  Thank

21   you.

22           MR. LOCKERT:      Yes, Your Honor.

23           (Respite).

24           THE COURT:      All right.  We're back.

25   Okay.  I have reviewed the State's exhibits.  I once

Exhibit 1 - Crouch MTD Memo        134

1   again reviewed Mr. Lockert's Motion to Dismiss.

2           First of all, let me start by saying that in

3   this instance when looking at this photograph, first of

4   all, the Court finds certainly that the Joseph Callaway

5   Facebook profile belongs, in fact, to the defendant

6   Mr. Garton.  That Mr. Garton, in fact, is the one that

7   posted this despicable photograph on Facebook and the

8   Court finds that he was wanting a certain amount of

9   attention, which it's clear that he got.

10          So looking at Mr. Lockert's Motion to

11  Dismiss, as far as this being protected speech, the

12  Court will first say that in this instance the Court

13  does not find this photograph to be protected speech

14  under the First Amendment.  The reason why, Mr. Lockert,

15  in your motion you cite to the Westboro Baptist Church,

16  another misaligned group of despicable people, in this

17  Court's view, with their signs showing up at funerals

18  and soldiers' funerals.

19          The Court said that their sign spoke to

20  issues of broad public import.  In this case, the Court

21  cannot find that a photoshopped picture of two

22  individuals urinating on a photo of deceased Sergeant

23  Daniel Baker of the Dickson County sheriff's office is a

24  broad public import outside of Dickson County.

25          Furthermore, in his own words, Mr. Garton

Exhibit 1 - Crouch MTD Memo    135

1   says that he had a list of at least eight officers that

2   were -- using my terms -- targets of his dissatisfaction

3   that he was going to be taking further action against.

4   Using terms like "make their lives a living hell, make

5   them pay," that sort of thing.  So in summation then,

6   this photograph that was posted to Facebook by Mr.

7   Garton, the Court finds it is not protected speech under

8   the First Amendment.

9          Having considered that, the Court will next

10  look at the statute for harassment under which

11  Mr. Garton is charged, Tennessee Code Annotated Section

12  39-17-308.  Let me start with -- first of all, it says

13  that under (a)(3), "communicating to another person,

14  with intent to harass that person, that a relative or

15  other person has been injured or killed when the

16  communication is known to be false."  Certainly, the

17  Court finds that that does not apply in this instance.

18          Under (b)(1), "a person convicted of a

19  criminal offense commits an offense if, while

20  incarcerated, on pretrial diversion, probation,

21  community correction or parole, intentionally

22  communicates in person with the victim of the person's

23  crime."  It goes onto say, other factors.  Certainly,

24  that statute or section of the statute does not apply.

25          We're left then with section (a)(1), (a)(2),

Exhibit 1 - Crouch MTD Memo    136

1    or (a)(4).  Section (a)(1) says that "a person commits

2    an offense who intentionally communicates a threat to

3    another person and the person communicating the threat,

4    intends the communication to be a threat of harm to the

5    victim, and a reasonable person would perceive the

6    communication to be a threat of harm."

7                It's interesting to note that this says

8    "communicates a threat to another person" in part (1)

9    but in part (a) under part (1) doesn't use the term

10   "intends the communication to be a threat of harm to

11   another person."  It says, "intends the communication to

12   be a threat of harm to a victim."  That is a specific

13   person.

14               The Court, therefore, takes it to mean that

15   communicating a threat to another person -- "intending

16   the communication to be a threat of harm to a victim and

17   a reasonable person would proceed the communication to

18   be a threat of harm" would mean that a person could

19   threaten to harm someone through a third person and it

20   could violate that code section.  That it would not have

21   to be a threat of harm communicated directly to the

22   victim.

23               Under number (2) it says, "communicates with

24   another person with that lawful person, anonymously or

25   otherwise, with the intent that the frequency or means

Exhibit 1 - Crouch MTD Memo     137

1   of the communications annoys, offends, alarms, or

2   frightens the recipient and, by this action, annoys,

3   offends, alarms, or frightens the recipient."

4          The Court finds it interesting to note that

5   in his communications, Facebook messages with retired

6   Officer Bailey, that he wrote "since my post is going

7   all over Facebook and I'm loving it."  Once again, I

8   said it seems that Mr. Garton was seeking a reaction,

9   apparently from as many people as he could possibly

10  reach.

11         Now, the testimony was that Mr. Garton

12  posted this photograph to his personal or to the

13  personal Facebook page of his alias, Mr. Callaway, and

14  that was the only place it was posted other than --

15  that's all the evidence was introduced to show -- other

16  than Mr. Garton's own words to Mr. Bailey that he had

17  posted on several other websites and had about

18  98 percent positive reaction, in his words, but there

19  was no evidence of that presented to the Court.  So

20  we're talking merely about Facebook.

21         Sergeant Baker's widow, Mrs. Baker,

22  testified that she had received the message or the

23  picture, that she came to know about it from people

24  sending it to her making her aware of it.

25         Sergeant Baker's mother testified that she

Exhibit 1 - Crouch MTD Memo    138

1    was made aware of the post and her personal feelings on

2    it.   Captain Arnold in the police department and retired

3    officer Mr. Bailey both testified of their reaction to

4    the photograph.   Mr. Bailey such that he even messaged

5    the page of Mr. Callaway and was communicating directly

6    with Mr. Garton about the photograph.

7                    Under number (4), it says, "communicates

8    with another person or transmits or displays an image

9    without legitimate purpose with the intent that the

10   image is viewed by the victim by any method described in

11   subdivision (a)(1), and the person maliciously intends

12   the communication to be a threat of harm to the victim,

13   and a reasonable person would perceive the communication

14   to be a threat of harm."

15                   In this case, it's important for the Court

16   to consider who would be victims of harassment from this

17   photograph.   Certainly, the Court would find that

18   Mrs. Lisa Baker having the closest relationship with

19   Sergeant Baker, being his widow, could be considered a

20   victim.   Sergeant Baker's mother could potentially be

21   considered a victim as well.   Certainly, the Court

22   understands the strong emotions that Captain Arnold and

23   Mr. Bailey would feel being so close with Sergeant

24   Baker, but certainly the Court would not consider them

25   to be victims of any harassment by simply seeing the

Exhibit 1 - Crouch MTD Memo    139

1    photograph.

2            In looking at those three subsections, two

3    of them require -- (a)(1) and (a)(4) require a threat of

4    harm to the victims.  They also require a reasonable

5    person test -- that a reasonable person perceived the

6    communication to be a threat of harm.

7            I'll go ahead and say under number (2),

8    "communicates with another person without lawful

9    purpose, anonymously or otherwise, with the intent that

10   the frequency or means annoys, offends, alarms, or

11   frightens the recipient."  The posting of one photograph

12   on Facebook that was posted on Mr. Callaway's, a/k/a

13   Mr. Garton's page, his friends, Facebook friends would

14   see, and it would be disseminated from there, that that

15   -- the Court cannot find that there is probable cause to

16   believe that that was -- that that was a violation of

17   that code section.

18           So we're left with (a)(1) and (a)(4).  The

19   Court having found that communicating the picture to

20   another person, certainly posting on Facebook, would do

21   that.  That's a form of communication specifically

22   covered by the statute.  "Transmitting or displaying an

23   image without legitimate purpose with the intent the

24   image is viewed by the victim by any method described in

25   subdivision (a)(1), and the person maliciously intends

Exhibit 1 - Crouch MTD Memo    140

1    the communication to be a threat of harm to the victim,

2    and a reasonable person would perceive the communication

3    to be a threat of harm."

4            The Court is, therefore, finds that those

5    statutory elements have been met insofar as the

6    photograph itself was communicated to another person.

7    Certainly, Mr. Garton, in his own words, intended for

8    the photograph to be viewed.

9            The Court having found that Mrs. Lisa Baker

10   certainly could be considered to be a -- would be

11   considered to be a victim in the case.  Therefore, the

12   last element is that the communication must be intended

13   to be a threat of harm to the victim and a reasonable

14   person would perceive the communication to be a threat

15   of harm.

16           As I previously said, certainly we're all

17   aware the photograph depicts two men urinating on a

18   tombstone, upon which the photograph Sergeant Baker has

19   been photoshopped or inserted on the front of the

20   tombstone.

21           We have Mr. Garton's words to Mr. Bailey.

22   The Court looking at the context of the conversation,

23   which started out with Mr. Bailey asking Mr. Garton why

24   would you post a -- not why would you post a picture

25   intending to put the viewpoint out that Mr. Garton hates

Exhibit 1 - Crouch MTD Memo    141

1  police officers, but that why would you use Daniel

2  Baker's picture?

3          No doubt Mr. Garton made clear his views.

4  He views police, law enforcement, judges, D.A.s, all to

5  be the enemy in his mind.  At one point Mr. Garton said,

6  "I mean, I can do some photoshop of his wife.  I've got

7  plenty of ideas running through my mind."  However, in

8  this instance, Mr. Garton did not do a photoshop of

9  Mrs. Baker.  He did a photoshop of deceased Sergeant

10 Daniel Baker's photograph on a tombstone being urinated

11 on.

12          The Court would take the clear view that the

13 opinion Mr. Garton is conveying in that photograph is,

14 for lack of a better term, piss on Daniel Baker, piss on

15 his grave.  That's Mr. Garton's viewpoint.  As

16 disgusting as this photo is, as juvenile, as unfunny,

17 unclever, unwitty as this is, the Court cannot find that

18 there's probable cause to believe that the posting of

19 this photograph constitutes a threat of harm to Lisa

20 Baker, but is instead a denigration of Sergeant Baker's

21 memory.  Therefore, respectfully, the Court dismisses

22 this count.

23          Anything else, Gentlemen?

24          MR. LOCKERT:    No, Your Honor.  Thank

25 you, Your Honor.

Exhibit 1 - Crouch MTD Memo    142

1          (Whereupon, the audio ends).

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1 - Crouch MTD Memo    143

**REPORTER'S CERTIFICATE**

1

2      I, Kim Davidson, LCR#540, licensed court

3  reporter and notary public, in and for the State of

4  Tennessee, do hereby certify that the above hearing was

5  recorded to compact disc on February 3, 2021, and that

6  the foregoing 143 pages of the transcript is a true and

7  accurate record to the best of my knowledge, skills and

8  ability.

9      I further certify that I am not related to

10  nor an employee of counsel or any of the parties to the

11  action, nor am I in any way financially interested in

12  the outcome of this case.

13      I further certify that I am duly licensed by

14  the Tennessee Board of Court Reporting as a Licensed

15  Court Reporter as evidenced by the LCR number and

16  expiration date following my name below.

17      IN WITNESS WHEREOF, I have hereunto set my

18  hand and affixed my notarial seal this 24th day of

19  February, 2021.

20

21

22                    KIM DAVIDSON, LCR#540

23                    Expiration Date 6/30/2022

My Commission Expires:    February 14, 2024

24

25